[Civ. No. 29194. Fourth Dist., Div. Two. Feb. 7, 1984.]

AMERICAN SECURITY BANK,
Plaintiff, Cross-defendant and Appellant, v.
HAROLD CLARNO, JR., Defendant, Cross-complainant and Appellant;
GEORGE A. HUNTER, JR.,
Defendant, Cross-complainant and Respondent.
RMG Tools, Inc., et al., Cross-defendants and Respondents.

**COUNSEL**

Best, Best & Krieger and Barton C. Gaut for Plaintiff, Cross-defendant and Appellant.

Steck & Marston and Emil Steck, Jr., for Defendant, Cross-complainant and Appellant and for Defendant, Cross-complainant and Respondent.

Gresham, Varner, Savage, Nolan & Tilden and Thomas N. Jacobson for Cross-defendants and Respondents.

## OPINION

**RICKLES, J.**—Plaintiff bank brought suit to enforce the personal guarantees of individual defendants. They cross-complained seeking declaratory relief and exoneration from personal guarantees on two loans to their financially troubled business. The bank appeals the trial court's orders of exoneration.

### FACTS

Defendants Clarno and Hunter were sole shareholders of Duncan-Hunter (Duncan) which in turn wholly owned Equipment Wholesalers, Incorporated (EWI). In March 1973, Duncan borrowed $200,000 from plaintiff American Security Bank (bank). Duncan executed a $200,000 promissory note, 85 percent of which was guaranteed by the Small Business Association (SBA). As a condition to the SBA's guarantee, Clarno and his wife, Hunter and his wife, and Giardina (one of Duncan's managers) and his wife executed continuing guarantees secured by trust deeds on their respective residences. The promissory note was also secured by a security agreement and financing statement on Duncan's machinery, equipment, furniture, fixtures, inventory, trade accounts receivable and materials then owned or thereafter acquired.

This loan was refinanced and increased to $275,000, as evidenced by an October 1973 promissory note. The March SBA guarantee was applied to this note. The perfected March security interest in Duncan was also tied to the October note. Similar individual guarantees were executed. In addition, EWI pledged its corporate assets to the bank as security. A 1975 financial statement for EWI was executed, but a formal security agreement was never acquired, and therefore a security interest in EWI's assets was never perfected.

In June 1975, in exchange for a $13,500 loan, EWI executed a promissory note in the bank's favor. A continuing guarantee by Clarno and Hunter dated May 16, 1973, was the only security for this note. It was around this time (1975) that financial difficulties beset Clarno and Hunter's business.

Duncan was forced to sell certain assets to RMG, a California corporation whose president was Giardina. RMG gave Duncan a $125,000 promissory note which was guaranteed by Giardina and Edward D. Slaughter. A security interest was perfected on RMG's inventory, tools, equipment, furniture, fixtures and supplies. The security agreement provided, inter alia: "All obligations secured by this Agreement shall become immediately due and payable without notice or demand to Buyer if any of the following shall occur . . . the commencement of any proceeding under any bankruptcy or insolvency law by or against the Buyer; . . ."

EWI assigned its unsecured assets for the benefit of creditors. One of EWI's liabilities was a $106,035.65 indebtedness to Duncan. Duncan, after filing a claim in connection with this assignment, voluntarily delivered to the bank the rights to and possession of all its assets. As a result, the bank recovered $12,200.08 on the Duncan claim, but was forced to expend $10,666.59 in attorney fees in order to do so. The assets turned over to the bank also included the RMG $125,000 note; Duncan directed the bank to apply any proceeds from that note to the $275,000 SBA indebtedness.

The bank filed the initial action against Clarno and Hunter seeking to enforce their individual guarantees of EWI's $13,500 loan. Clarno and Hunter cross-complained,[1] seeking exoneration from their guarantees and a declaration by the court of the respective rights and duties of all parties concerning the indebtedness of Duncan and EWI to the bank.

The court issued the following findings and conclusions: (1) It awarded Clarno and Hunter attorney fees of $15,000 for their cross-complaint which resulted in a partial exoneration of their personal guarantees. (2) The bank was found to have had an implied-in-law duty to perfect a security interest on the EWI assets given as security for the payment on the $275,000 SBA note, and therefore the failure to perfect impaired the bank's rights against Duncan. (3) The failure to perfect security in the EWI assets deprived Clarno and Hunter of subrogation rights in such assets. (4) The failure to perfect this security interest violated the bank's duty of continuous good faith and fair dealing to the guarantors. (5) The failure to perfect the EWI security caused a loss to Clarno and Hunter to the extent of $93,835.58 (the amount which the bank as general creditor of a $106,035.65 total failed to obtain after the EWI assignment) plus $10,666.59 (the amount expended in attorney fees for the EWI bankruptcy claim which the bank unilaterally added to the $275,000 SBA indebtedness); total loss was $104,502.17. (6) Clarno and Hunter were partially exonerated from their personal guarantees on the $275,000 loan by $104,502.17. (7) Giardina was also exonerated from his guarantee to the same extent. (8) The failure of the bank to institute security foreclosure proceedings on the RMG $125,000 note when RMG filed for bankruptcy (a) impaired the rights and remedies of the bank as creditor against RMG and (b) impaired the subrogation rights of Clarno and Hunter as guarantors. (9) At the time the bankruptcy proceedings were instituted, RMG's balance on the note was $101,000, and as of April 22, 1981 (three months before trial) the unpaid principal balance was $41,916.14. Clarno and Hunter were partially exonerated from their personal guarantees on the $275,000 in the sum of $101,000. (10) Giardina was exonerated to the same extent. (11) The principal balance on the $275,000 SBA note was

---

[1]RMG and Giardina were named as cross-defendants in this action.

$172,390.10 which was reduced by (a) the amount received from the EWI assignment and (b) $10,666.59 (the amount which the bank unilaterally added to the principal for the attorney fees expended on the EWI assignment proceedings).

In its judgment the court ruled: ". . . Clarno and . . . Hunter . . . as guarantors of the [EWI] loan ($13,500) . . . are exonerated to the extent of any unused balance of the total amounts of the exonerations [above] . . . after application of such sums to any balance of principal and interest remaining unpaid under said [SBA] loan when such loan becomes due."[2] In summary, the court found Clarno and Hunter liable for the $13,500 loan to EWI. The court found the principal balance on the SBA note to be $172,390.10. The court exonerated Clarno, Hunter and Giardino's guarantees on the SBA note by (a) $104,502.17 and (b) $101,000. The total amount of exoneration exceeded the SBA indebtedness by $33,112.07. The court therefore applied this excess to the $13,500 EWI indebtedness, totally absolving Clarno and Hunter of any liability on the guarantees.

The bank appeals these rulings contending, inter alia, (1) the court erred in exonerating Clarno and Hunter because of the written waivers they executed; (2) no act of the bank has exonerated Clarno and Hunter's guarantees; (3) it was improper to apply the SBA loan exoneration to the EWI loan; and (4) the court should not have awarded Clarno and Hunter attorney fees.

DISCUSSION

I

The controversy in this case centers around two writings, an unconditional guarantee and a simultaneously executed letter agreement. The former seeks to cover many contingencies which may arise in a personal guarantee. It is meticulously written. The latter is a two paragraph procedural addendum which sets the sequences of events the lender must follow should the borrower default. Ironically, Clarno and Hunter argue the former is not nearly detailed enough to support the bank's theories for reversal. Further they suggest an interpretation of the latter which would have the effect of wiping out nearly every contingency and result dealt with by the former. The unconditional guarantee, a prerequisite to the SBA's own 85 percent guarantee, drafted by the SBA and not the bank as defendants suggest, provides in part: "The Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the Undersigned, but subject to

---

[2]The court also denied Clarno's breach of contract claim against the bank concerning the rights to transfer the indebtedness on his personal residence. The underlying facts of Clarno's appeal are discussed *infra*.

the provisions of any agreement between the Debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers: (a) To modify or otherwise change any terms of all or any part of the Liabilities or the rate of interest thereon . . ., to grant any extension or renewal thereof and any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto; (b) to enter into any agreement of forbearance with respect to all or any part of the Liabilities, or with respect to all or any part of the collateral, and to change the terms of any such agreement; (c) to forbear from calling for additional collateral to serve any of the Liabilities or to secure any obligation comprised in the collateral; (d) to consent to the substitution, exchange, or release of all or any part of the collateral . . . . [¶] In case the Debtor shall fail to pay all or part of the Liabilities when due . . . the Undersigned, immediately upon written demand of the Lender, will pay to Lender the amount due and unpaid by the Debtor . . . Lender shall not be required . . . to make any demand upon or pursue or exhaust any of its rights or remedies against Debtor or others with respect to the payment of any of the Liabilities, or to pursue or exhaust any of its rights or remedies with respect to any part of the collateral. The Undersigned shall have no right of subrogation whatsoever with respect to the Liabilities or the collateral unless and until Lender shall have received full payment of all the Liabilities . . . ."

Despite this strong language Clarno and Hunter contend the bank's failure to perfect a security interest in subsidiary corporation's assets (EWI) exonerates their obligations, even though the loan was made to the parent corporation (Duncan). They base their assertion on the signed letter agreement, by Clarno, Hunter and the bank, entered into simultaneously with the promissory note and their guarantees which in pertinent part provides: "It is hereby understood and agreed that in the event of default of this loan the lender will exhaust all remedies against Duncan-Hunter Co. first, before proceeding against the assets covered by the personal guarantees of the individuals." Defendants argue this letter agreement both alone and in combination with suretyship law operates to release their guarantees.

Part of the statutory scheme which Clarno and Hunter attempt to engage is located in the California Uniform Commercial Code. Section 3606 provides: "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder . . . (b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse. . . ."

Initially we point out defendants' reliance on section 3606 is misplaced. That section applies to discharge only a party to an instrument. An

instrument is defined as a negotiable instrument (Cal. U. Com. Code, § 3102, subd. (1)(e)) which in turn is defined in section 3104. A promissory note can be an instrument if it meets these requirements. The unconditional guarantees, the writings from which defendants seek discharge, do not qualify as instruments. This discussion need go no further because Clarno and Hunter were not parties to the $275,000 SBA note. Hence, section 3606 and those cases relying on this section are inapplicable. Even if this were not the case, our decision would still remain the same.

 Clarno and Hunter contend the bank knew of EWI's existence at the time the loan to Duncan was made. The bank acquired only a corporate pledge of EWI's assets, but failed to perfect this pledge by filing a financing statement under article nine of the California Uniform Commercial Code (§ 9302). Thus, we are asked to find the failure to acquire a perfected security interest in the subsidiary's assets when a loan is made to the parent operates to discharge a surety under California Uniform Commercial Code section 3606 and/or Civil Code section 2819.[3]

Clarno and Hunter cite us to two lines of cases in support of their exoneration contention. The first line involves a situation where a party agrees to act as a surety on a loan, the proceeds of which go to purchase a particular chattel. When the lender fails to perfect a security interest in this chattel in which it holds title, the surety claims pro tanto release. Accordingly, these courts rely in part on California Uniform Commercial Code section 9207, subdivision (1),[4] in releasing the surety to the extent of the impairment on the security. (See *White* v. *Household Finance Corporation* (1973) 158 Ind.App. 394 [302 N.E.2d 828]; *Shaffer* v. *Davidson* (1968 Wyo.) 445 P.2d 13.) We do not believe *White* and *Shaffer* provide authority to exonerate the sureties in this case. Those loans were made to individuals for the express purpose of acquiring a chattel. The lender knew of this purpose and contemplated a security interest in the chattel. In the case at bar, the loan was made to a corporation troubled by cash-flow deficiencies. No conditional sales contract was contemplated nor was there an implicit or explicit agreement to secure the assets of the corporation's subsidiary. The letter agreement in the present case will not save the defendants from the distinctions we observe in *White* and *Shaffer*. We are not persuaded that had such an agreement been before those courts a different result would have occurred.

---

[3]Civil Code section 2819 provides: "A surety is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

[4]California Uniform Commercial Code section 9207, subdivision (1), provides: "A secured party must use reasonable care in the custody and preservation of collateral in his possession. . . ."

The second line of cases includes *D. W. Jaquays & Co.* v. *First Security Bank* (1966) 101 Ariz. 301 [419 P.2d 85], and *Behlen Mfg. Co.* v. *First National Bank of Englewood* (1970) 28 Colo.App. 300 [472 P.2d 703]. In *Jaquays,* the defendant corporation was a creditor of Mesa Steel as a result of a conditional sales contract involving an air compressor. Defendant corporation transferred its interest to plaintiff bank and included an unconditional guarantee in which it consented "without notice, to any extensions or forbearance by assignee, and waives any demand or notice of default." Mesa Steel went bankrupt and defendant refused to honor its guarantee because the bank failed to record the conditional sales contract. The court, in releasing defendant, cited 50 American Jurisprudence, Suretyship, section 118: "The collateral security taken by a creditor may require some act on the part of the creditor to make it a valid security. Where such is the case, the law implies an agreement on his part to perform that act. If he neglects or fails to do so and the security is thereby lost or impaired, the surety may be discharged to the extent of his loss or injury." The bank argued the unconditional guarantee plus the waiver precluded the surety's release. The court disagreed, finding that any waiver must be clear and unequivocal. It distinguished another case where the waiver "granted full power to the guarantee, in its uncontrolled discretion to deal in any manner with the collateral security." (419 P.2d at p. 89.)

The *Jaquays* court found the bank breached an implied-in-law duty to record. However, it had to distinguish a case with a stronger waiver than the one before it. In viewing the waiver before this court, we find it is even stronger than the one which *Jaquays* distinguished. The letter agreement does not make it less so.

In fact in *Union Bank* v. *Ross* (1976) 54 Cal.App.3d 290 [126 Cal.Rptr. 646], it was held that a surety could waive its rights under Civil Code section 2819. In that case, the surety did so by agreeing "to waive all rights to require the bank 'to apply any security Bank may hold at any time or to pursue any other remedy.'" (*Id.,* at p. 294.) We conclude the waiver at bar was at least as clear as the one in *Ross.*

In addition, nowhere in the record is there any suggestion that the bank obligated itself to perfect security in EWI's assets. In *Joe Heaston Tractor & Imp. Co.* v. *Securities Accept. Corp.* (10th Cir. 1957) 243 F.2d 196, the surety unconditionally guaranteed payments on all accounts. The creditor made the loans, took back chattel mortgages, but failed to perfect the liens. When the surety argued this failure released the guarantee, the court responded, "[t]he contract of guarantee makes reference to secured loans but it does not specifically require the taking of mortgages or that the same, if taken, be recorded." (243 F.2d at p. 198. See also *American Bank of Com-*

*merce* v. *Covolo* (1975) 88 N.M. 405 [540 P.2d 1294, 1298-1299].) The unconditional guarantee in *Joe Heaston Tractor* included the following language: " 'The undersigned grants to the Finance Company full power to modify or change terms of any of the Liabilities, to agree to forbearance with respect thereto, to consent to the substitutions or exchange or release of collateral thereto, and extension of time of payment of the Liabilities.' " (243 F.2d at p. 198.)

In the instant case, the guarantee granted the lender "full power . . . to deal in any manner with the Liabilities and the collateral . . . [including the power] to consent to the substitution, exchange or release . . . of the collateral. . . ." These guarantees are nearly identical. In addition, the *Joe Heaston Tractor* court concluded even though the unsecured collateral was mentioned in the guarantee, absent an express agreement to perfect the lien, the surety would not be released. In the instant case the unsecured EWI collateral was never mentioned in the guarantee. These facts strongly support the *Joe Heaston Tractor* holding that the sureties should not be released.

Turning now specifically to the letter agreement, we find it has no modification effect on the waiver language in the guarantees. This document is at best an agreement as to the sequence in which assets will be used to satisfy the $275,000 SBA indebtedness. The issue before us has nothing to do with which assets will be used in what order to satisfy this obligation. Rather, the issue is whether the bank was obligated to perfect the EWI security. This letter agreement does not even mention EWI assets. It only refers to Duncan assets.

Viewing the letter agreement in this light, we are thoroughly convinced it could not possibly have required the perfection of EWI's assets as a prerequisite to the enforcement of Clarno and Hunter's guarantees. No case requires a creditor to acquire every bit of security possible prior to imposing liability on a surety. Such a ruling would throw commercial transactions and suretyship law into utter chaos. We emphatically decline to rewrite these laws.

Clarno and Hunter also assert, and the trial court found, the failure to perfect the EWI security violated the bank's duty of continuous good faith and fair dealing to the guarantors. (See *Sumitomo Bank of Cal.* v. *Iwasaki* (1968) 70 Cal.2d 81 [73 Cal.Rptr. 564, 447 P.2d 956].) That duty requires a creditor to disclose pertinent facts which would materially increase the risk the surety intended to assume. The bank did not fail to disclose any such facts. Furthermore, Clarno and Hunter do not cite any authority, nor can we find any, to hold this duty requires the lender of a

corporation to perfect security in its subsidiary absent an express agreement to do so. Therefore, the bank did not breach the duty of good faith and fair dealing with plaintiff surety.

## II

■ Turning now to the RMG $125,000 note, we must again conclude the waiver precludes exoneration. (See *Bloom* v. *Bender* (1957) 48 Cal.2d 793 [313 P.2d 568].) Clarno and Hunter contend the bank's failure to pursue its secured creditor position upon RMG's filing for bankruptcy released their guarantees. However, the waiver provides in part: "The Lender shall not be required . . . to exhaust any of its rights or remedies with respect to any part of the collateral." Both California Uniform Commercial Code section 3606 and Civil Code section 2819 call for release or exoneration only as a result of acts to which the surety does not consent; Clarno, Hunter and Giardina consented to the possibility the bank would not pursue its secured creditor's remedies. Therefore, the court erred in exonerating Clarno, Hunter, and Giardina of their personal guarantees.

## III

■ Clarno and Hunter's guarantees were secured by deeds of trust on their residences. An agreement was executed between the guarantors and the bank providing these trust deeds "can be released upon the sale of [the] residence, provided, that the new residence purchased with the proceeds of the sale will be encumbered with a trust deed to cover the above loan in place of the one released. The new encumbrance would be in a second position." Clarno attempted to sell his residence and requested the bank to release the trust deed. The bank refused to release unless all proceeds received from the sale were applied to the newly acquired residence. Clarno brought suit for damages resulting from this refusal. The court found for the bank and awarded attorney fees.

Clarno's appeal on this matter will not overturn this result. The bank was entitled to rely on all acquired equity resulting after the guarantees were made. Clarno could not sell his first residence and then purchase another at a lower price without adversely affecting the bank's position spelled out in the guarantee. The bank was justified in refusing to release Clarno's trust deed.

## DISPOSITION

The lower court found Clarno and Hunter liable on their individual guarantees of EWI's $13,500 note. Because no appeal is taken on this portion

of the judgment, it remains intact, and valid. ■ The effect of the court's judgment, however, wiped out Clarno and Hunter's liability on this $13,500 guaranty because, after applying the exoneration to the $275,000 liability, an excess resulted which the court then applied to the $13,500 liability. The court erred. In essence there were two separate obligations evidenced by separate writings. Even if we were to conclude exoneration was proper in one, no authority exists to apply any excess to the other. Clarno and Hunter's favorable judgment on their cross-complaint for exoneration is reversed as is the order awarding them attorney fees. This necessarily means that in the cross-complaint the bank was the prevailing party and as such may be entitled to attorney fees under the guarantees. The lower court is directed to make this determination and award the bank any applicable attorney fees.

There is some confusion as to whether Giardina, as a cross-defendant in Clarno and Hunter's cross-action, properly requested to be relieved of liability in the event of a successful result in this action. However, we conclude Giardina stands in the same position as Clarno and Hunter and, therefore, the judgment exonerating him is also reversed.

Finally, there is some confusion over the present amount of the SBA indebtedness—particularly because the bank summarily added earlier acquired attorney fees to the principal. The lower court improperly determined the amount because that issue was never before it. We, therefore, express no opinion as to the amount presently due on this note or whether the attorney fees added to the principal were proper.

The lower court is directed to modify the judgment in accordance with this opinion.

Kaufman, Acting P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied March 1, 1984, and the petition of appellant Clarno and respondent Hunter for a hearing by the Supreme Court was denied April 18, 1984.