CONNECTICUT NATIONAL BANK v.
JUDITH C. DOUGLAS ET AL.
(14423)

PETERS, C. J., CALLAHAN, COVELLO, BORDEN and BERDON, Js.

Argued February 11—decision released April 7, 1992

*John E. LeMoult,* for the appellant (defendant Jerald L. Nelson).

*Theodore C. Killiam,* with whom, on the brief, was *David Brown,* for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is the scope of a secured lender's obligation to participate in

workout arrangements relating to the disposition of secured collateral in the hands of the debtor. The plaintiff, Connecticut National Bank (bank) brought an action against the defendants, Judith C. Douglas, Jerald L. Nelson (Nelson), Sidney A. Staunton, Robert Zbell and Robert M. Paradis, as guarantors of the unpaid debt of Jefferson Pine, Inc. (Jefferson Pine). The trial court rendered judgments in favor of the bank, either by default or by stipulation, against all the defendants except Nelson. The bank's action against Nelson was tried to a jury. In that trial, the trial court directed a verdict for the bank against Nelson in the amount of $632,288.92 after Nelson rested his case at the close of the presentation of the bank's evidence. Nelson appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to Practice Book § 4023.

The facts concerning the commercial arrangements between the parties are undisputed. On March 11, 1987, the bank agreed to lend $550,000 to Jefferson Pine, which was in the business of manufacturing and selling consumer furniture. To memorialize and secure this loan, Jefferson Pine signed a loan and security agreement that gave the bank a security interest in Jefferson Pine's inventory, equipment and other collateral. Contemporaneously, Jefferson Pine executed two instruments with respect to the underlying debt payable to the bank, a term note in the principal amount of $300,000 and a demand grid note for a line of credit in the amount of $250,000. The bank continues to be the holder of these notes.

As a part of the loan negotiations, Nelson and the other individual defendants agreed to assure the payment of Jefferson Pine's obligations to the bank. Each manifested his or her obligation as guarantor: by a guaranty contained in the security and loan agreement; by an endorsement on the face of the two promissory

notes; and by a separate guaranty agreement. No question has been raised about the validity of the defendants' signatures or about their knowing assent to these three forms of guaranty. Each of the guarantors was involved in Jefferson Pine's business. Nelson was then its chief operating officer and its principal shareholder.

Jefferson Pine encountered difficulties in meeting its financial obligations. On April 28, 1988, in order to continue to operate its business and to pay off its debts, it submitted to the bank a proposal for a workout plan, which the bank rejected. The details of that plan have not, however, been presented to this court. Nelson's pleadings allege that the plan contemplated that, under certain unspecified conditions, the Phoenix Northeast Corporation might advance new funds to Jefferson Pine. On May 2, 1988, shortly after the bank's rejection of the plan, Jefferson Pine ceased doing business and eleven days thereafter it invoked the protection of the federal bankruptcy laws. It first filed a voluntary petition for protection from creditors under chapter 11 of the Bankruptcy Code. After another unsuccessful attempt at a workout plan, the bankruptcy filing was converted into a liquidation proceeding under chapter 7 of the Bankruptcy Code and the assets of Jefferson Pine were sold. The bank received a partial payment and then initiated the present action to recover the remainder of the unpaid indebtedness from the defendants.

The dispute between the parties on this appeal does not directly challenge the trial proceedings that led to the verdict in the bank's favor. Nelson maintains instead that he is entitled to a new trial because two of the trial court's procedural rulings improperly limited the scope of the issues that he was able to present at trial. He contends that the trial court incorrectly (1) granted the bank's motion to strike his first, sec-

ond and third special defenses, and (2) denied his request for leave to file an amended pleading. We are unpersuaded by either claim.

I

The bank filed its motion to strike in response to Nelson's second revised and amended answer, special defenses, counterclaim and cross complaint. It asked the trial court to strike the first six of Nelson's special defenses,[1] his counterclaim and the second count of his cross complaint. Granting the bank's motion in part, the trial court struck Nelson's first, second, third and sixth special defenses and counts four and five of his counterclaim.[2] Nelson contends that the trial court should not have struck its first, second and third special defenses.[3] We disagree.

---

[1] Nelson's seventh special defense, to which the bank did not object, asked the bank to reduce its claim by the amount that it had recovered in the liquidation of the assets of the corporate debtor.

[2] The trial court left standing, for subsequent trial to the jury, two sets of contentions that were raised by Nelson's special defenses and counterclaim. The court permitted Nelson to go forward with his contention, in his fourth and fifth special defenses and in counts two and three of his counterclaim, that the bank's refusal to cooperate with the corporate defendant's plan for a workout constituted a breach of the bank's implied covenant of good faith and fair dealing. General Statutes §§ 42a-1-203, 42a-1-106; 2 Restatement (Second), Contracts § 205 (1979). The trial court also saved for trial the first count of Nelson's counterclaim, which alleged that the bank's conduct constituted an unfair or deceptive trade practice under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110 (b). Nelson has not pursued on appeal any challenge to the adverse verdict on these claims.

[3] The merits of the trial court's ruling on the bank's motion to strike are properly before us because, on May 2, 1990, within the time period specified by Practice Book § 4002 (a), Nelson filed a notice of appeal and reservation of appeal with respect thereto.

Nelson has not pursued on appeal the merits of his sixth special defense that the bank's conduct constituted an unfair or deceptive act or practice in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110b. A similar claim

All three special defenses focused on the same factual allegations of misconduct. In each, Nelson alleged that the bank had unjustly impaired the inventory of Jefferson Pine by its refusal: (1) to implement Jefferson Pine's workout plans; (2) to authorize disposal of the inventory; and (3) to take possession of the inventory and thereafter to dispose of it in accordance with its statutory obligations under article 9 of the Uniform Commercial Code. Nelson alleged that "the aforesaid actions of the [bank] concerning the disposition of Jefferson Pine Inc.'s inventory" caused the Phoenix Northeast Corporation not to advance any funds to Jefferson Pine and caused the value of the inventory to diminish substantially. As a result of this alleged misconduct, Nelson claimed that his guaranty had been rescinded, in the first special defense because the bank had failed to act in a commercially reasonable manner in violation of General Statutes § 42a-9-507 (1),[4] in the second special defense because the bank had impaired the value of the inventory in violation of General Statutes § 42a-3-606 (1) (b),[5] and in the third special defense

was resolved through the adverse verdict on the first count of Nelson's counterclaim.

Nelson withdrew his cross complaint against the defendants Zbell and Paradis on July 26, 1991.

[4] General Statutes § 42a-9-507 (1) provides: "If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price."

[5] General Statutes § 42a-3-606 (1) (b) provided, at the time of this case: "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder . . . (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

because the bank had impaired the value of the inventory in violation of his common law rights as guarantor.

In its ruling on the bank's motion to strike, the trial court recognized its obligation to take the facts to be those alleged in the special defenses and to construe the defenses in the manner most favorable to sustaining their legal sufficiency. *Warner* v. *Konover,* 210 Conn. 150, 152, 553 A.2d 1138 (1989); *Michaud* v. *Wawruck,* 209 Conn. 407, 408, 551 A.2d 738 (1988); *Amodio* v. *Cunningham,* 182 Conn. 80, 82, 438 A.2d 6 (1980). Even viewed from this generous perspective, the special defenses are notable for what they do *not* allege. Nelson has not asserted that the bank impaired Jefferson Pine's own authority to sell its inventory in the ordinary course of its business; see General Statutes § 42a-9-307 and § 42a-9-306 (1) and (2).[6] Nelson has likewise not claimed that the loan and security agreement between the bank and Jefferson Pine imposed upon the bank any special responsibility for, or control over, the inventory held for sale by Jefferson Pine. Finally, Nelson has not alleged that the negotiations with the Phoenix Northeast Corporation contemplated a subordinated indebtedness within the

[6] General Statutes § 42a-9-307 provides in pertinent part: "PROTECTION OF BUYERS OF GOODS. (1) A buyer in ordinary course of business as defined by subsection (9) of section 42a-1-201 . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

General Statutes § 42a-9-306 provides: " 'PROCEEDS'; SECURED PARTY'S RIGHTS ON DISPOSITION OF COLLATERAL. (1) 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . . (2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

In Nelson's answers to interrogatories propounded by the bank, he acknowledged that he did "not claim that Jefferson Pine was prevented or disabled from selling its inventory due to the failure or neglect of the [bank] to authorize the sale of said inventory."

exclusion of section 5.2 of the loan and security agreement.[7] Nelson's allegations come down to the proposition that the bank had wrongfully failed to renegotiate in good faith the restrictions in the loan and security agreement that limited the bank's obligations to continue to fund Jefferson Pine's operations and that imposed constraints on Jefferson Pine's use of its cash, accounts and inventory.[8]

## A

The linchpin of Nelson's argument to sustain his first special defense is that the bank constructively took possession of Jefferson Pine's inventory when it failed to agree to the conditions of the plan that would have given Jefferson Pine access to new funding from the Phoenix Northeast Corporation. This contention has two flaws, one procedural and one substantive.

As a procedural matter, the factual allegations on which Nelson relies expressly complain of the bank's refusal "to take possession." As the bank has noted, it is inconsistent simultaneously to charge the bank with having refused to take possession and with having

_____

[7] Article V of the loan and security agreement, entitled "Negative Covenants" provided that, until payment in full of the borrower's obligation, "unless the Bank otherwise consents in writing, the Borrower shall not . . . Section 5.2 Limitation on Indebtedness. Create or incur any indebtedness or obligation for borrowed money, or issue or sell any obligations of the Borrower, excluding, however, from the operation of this covenant: (a) the loan hereunder and all other liabilities of the Borrower to the Bank; and (b) indebtedness subordinated in payment and priority to all indebtedness of the Borrower to the Bank in writing and in form and substance satisfactory to the Bank."

[8] Despite probing interrogatories by the bank, Nelson never clarified whether he claimed that the bank had wrongfully refused to permit Jefferson Pine to sell its inventory in bulk or in some other commercial manner not in the ordinary course of business; see General Statutes § 42a-9-307 and section 5.3 of the loan and security agreement; or whether he claimed that the bank had wrongfully refused to relinquish its security interest in the proceeds of the sale of the inventory. See General Statutes § 42a-9-306 (2) and section 1.9 of the loan and security agreement.

taken constructive possession. *Hoard* v. *Sears, Roebuck & Co.,* 122 Conn. 185, 191–92, 188 A. 269 (1936); 1 E. Stephenson, Connecticut Civil Procedure (1970) § 128 (c), pp. 528–30. After the motion to strike had been granted, Nelson would have been free to amend his pleadings to substitute an allegation of constructive possession, but he did not do so.

As a substantive matter, the bank's alleged failure to agree to a workout plan does not, without more, constitute the taking of constructive possession of Jefferson Pine's inventory.[9] Nelson's claim must be measured against a definition of what constitutes constructive possession. Under our penal code, we have held that a person is in constructive possession who knowingly has the power and the intent to exercise dominion or control over personal property. "The essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." *State* v. *Hill,* 201 Conn. 505, 516, 523 A.2d 1252 (1986); see also *State* v. *Somerville,* 214 Conn. 378, 390, 572 A.2d 944 (1990); *State* v. *Reddick,* 207 Conn. 323, 328, 541 A.2d 1209 (1988); *State* v. *Alfonso,* 195 Conn. 624, 633, 490 A.2d 75 (1985); *State* v. *Ober,* 24 Conn. App. 347, 351, 588 A.2d 1080, cert. denied, 219 Conn. 909, 593 A.2d 134–35 (1991). In the civil context, we have held that a landlord's conduct may constitute the constructive

---

[9] In his reply brief, Nelson suggests for the first time that "[m]uch of the inventory was machinery." Article 9 of the Uniform Commercial Code, on which Nelson relies for this claim, makes a sharp distinction between inventory and equipment. See General Statutes § 42a-9-109. For Jefferson Pine, which was engaged in the business of selling furniture, its machinery was equipment and not inventory. A defense charging the bank with misconduct with respect to inventory therefore does not encompass a claim with respect to machinery.

eviction of a tenant if the landlord, "while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent." (Internal quotation marks omitted.) *Amsterdam Realty Co.* v. *Johnson,* 115 Conn. 243, 248, 161 A. 339 (1932); *Conference Center Ltd.* v. *TRC,* 189 Conn. 212, 220–21, 455 A.2d 587 (1983). Consistently with these holdings, Black's Law Dictionary (5th Ed. 1979), in defining "possession," posits that "[a] person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing . . . is then in constructive possession of it."

We therefore conclude that, in order to state a cause of action charging the bank with constructive possession, Nelson would have had to allege, as a minimum, that the bank had the power and the manifested intent to displace Jefferson Pine's control over its inventory or somehow to render that inventory commercially unmarketable. Nelson's allegations, with their focus on the bank's purported misconduct in refusing to renegotiate the terms of the security agreement with Jefferson Pine, do not state such a cause of action. On the facts alleged, the trial court therefore correctly determined, as a matter of law, that the bank was not in constructive possession of Jefferson Pine's inventory before its bankruptcy.

In the absence of either actual or constructive possession by the bank, Nelson cannot prevail on his claim that the bank violated his rights under part 5 of article 9 of the Uniform Commercial Code. While article 9 permits a secured party, upon default, to take possession of the secured collateral, it does not compel such a course of action. General Statutes §§ 42a-9-501,

42a-9-503, 42a-9-504, 42a-9-505;[10] *Connecticut Bank & Trust Co.* v. *Incendy,* 207 Conn. 15, 21, 540 A.2d 32 (1988); 2 G. Gilmore, Security Interests in Personal Property (1965) §§ 43.6, 44.1; 2 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) § 27-4. Section 42a-9-507 makes a secured party liable for losses caused by a faulty disposition of secured collateral only if "the secured party is not proceeding in

---

[10] General Statutes § 42a-9-501 provides in relevant part: "DEFAULT; PROCEDURE WHEN SECURITY AGREEMENT COVERS BOTH REAL AND PERSONAL PROPERTY. (1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in section 42a-9-207. The rights and remedies referred to in this subsection are cumulative. . . . (5) When a secured party has reduced his claim to judgment the lien of any levy which may be made upon his collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral. A judicial sale, pursuant to such execution, is a foreclosure of the security interest by judicial procedure within the meaning of this section, and the secured party may purchase at the sale and thereafter hold the collateral free of any other requirements of this article."

General Statutes § 42a-9-503 provides: "SECURED PARTY'S RIGHT TO TAKE POSSESSION AFTER DEFAULT. Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under section 42a-9-504."

General Statutes § 42a-9-504 provides in relevant part: "SECURED PARTY'S RIGHT TO DISPOSE OF COLLATERAL AFTER DEFAULT; EFFECT OF DISPOSITION. (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . . (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in

accordance with the provisions of this part." Article 9 imposes no duties on a nonpossessory secured lender with regard to the disposition of the secured collateral.

Our conclusion that the bank, on the facts alleged, had no duty to take any action with respect to Jefferson Pine's inventory before its bankruptcy necessarily means that the bank had no such duty after its bankruptcy. As Professors White and Summers point out, the secured debtor's bankruptcy may impair, but does not enlarge, the secured lender's access to the secured collateral. 2 J. White & R. Summers, supra, § 25-12, pp. 471–72. We are unpersuaded that the bank's alleged refusal to allow inventory to be sold free and clear of its security interest is tantamount to the bank's taking constructive possession of the inventory.

parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable."

General Statutes § 42a-9-505 provides: "COMPULSORY DISPOSITION OF COLLATERAL; ACCEPTANCE OF THE COLLATERAL AS DISCHARGE OF OBLIGATION. (1) If the debtor has paid sixty per cent of the cash price in the case of a purchase money security interest in consumer goods or sixty per cent of the loan in the case of another security interest in consumer goods, and has not signed after default a statement renouncing or modifying his rights under this part a secured party who has taken possession of collateral must dispose of it under section 42a-9-504 and if he fails to do so within ninety days after he takes possession the debtor at his option may recover in conversion or under section 42a-9-507 (1) on secured party's liability. (2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received, before sending his notice to the debtor or before the debtor's renunciation of his rights, written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under section 42a-9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."

If Nelson's argument were sustained, Jefferson Pine's bankruptcy would require the bank to choose between two losing propositions: relinquishing its lien on the inventory or proceeds of inventory in the possession of an insolvent debtor, or assuming accountability for the declining value of an insolvent debtor's inventory. Nelson has cited no authority for imposing such a draconian choice on the bank in this case. The Bankruptcy Reform Act of 1978, 11 U.S.C.A. § 363 (1979 & Sup. 1991), does not mandate such a result, and we decline to mandate it as a matter of state law.

Because the bank had neither actual nor constructive possession of Jefferson Pine's inventory, either before or after its bankruptcy, we conclude that Nelson has not alleged a breach of any duty by the bank in its refusal to agree to Jefferson Pine's plan for refinancing. Accordingly, we conclude that the trial court correctly struck Nelson's first special defense.

B

Nelson's second and third special defenses alleged that the bank's conduct had impaired the secured collateral in such a way as to discharge him as guarantor, either under article 3 of the Uniform Commercial Code, General Statutes § 42a-3-606 (1) (b), or under the common law rules governing the relationship between creditors and guarantors. See 1 J. White & R. Summers, supra, § 13-15. The trial court concluded that these defenses were untenable as a matter of law for three independent reasons: (1) Nelson could not invoke § 42a-3-606 because that section only applied to negotiable instruments and the variable interest rate provision in the notes violated the requirement of General Statutes §§ 42a-3-104 and 42a-3-106[11] that a negotia-

[11] General Statutes § 42a-3-104 provides in relevant part: "FORM OF NEGOTIABLE INSTRUMENTS; 'DRAFT'; 'CHECK'; 'CERTIFICATE OF DEPOSIT'; 'NOTE.' (1) Any writing to be a negotiable instrument within this article

ble instrument must contain an unconditional promise or order to pay "a sum certain"; (2) even if § 42a-3-606 principles were applicable, or if Nelson could rely on parallel common law principles under which a guarantor is discharged by a creditor's impairment of collateral, Nelson's pleading was insufficient because it did not allege that the bank had engaged in some affirmative act that impaired the value of the collateral; and (3) Nelson was barred from asserting any claims arising out of impairment of the value of the collateral because he had expressly waived such a right in the guaranties he had signed. We agree that Nelson's express waiver bars his second and third defenses, and therefore do not need to consider the other grounds upon which the trial court ruled against him.

The documents that memorialize Nelson's guaranty of Jefferson Pine's indebtedness demonstrate, on their face, that Nelson expressly waived any right he might otherwise have had to complain of the impairment of his right to be subrogated to the bank's interest in the secured collateral in the possession of Jefferson Pine. Each of these documents contains an express waiver of the right to assert any claim with regard to any action the bank might take, or not take, with regard to Jefferson Pine's collateral. Nelson signed the loan

must (a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer."

General Statutes § 42a-3-106 provides in relevant part: "SUM CERTAIN. (1) The sum payable is a sum certain even though it is to be paid (a) with stated interest or by stated instalments; or (b) with stated different rates of interest before and after default or a specified date; or (c) with a stated discount or addition if paid before or after the date fixed for payment; or (d) with exchange or less exchange, whether at a fixed rate or at the current rate; or (e) with costs of collection or an attorney's fee or both upon default; or (f) with provision for payment by the maker of taxes levied or assessed upon the instrument or the indebtedness evidenced thereby."

and security agreement as guarantor and thereby agreed that "[t]he bank shall have no duty as to the collection or protection of the Collateral or any income thereon."[12] As a guarantor of the term note and the demand grid note, Nelson agreed that "[u]nless and until all liabilities of the Borrower evidenced by said note have been paid in full, the undersigned hereby individually and collectively waive any and all rights of subrogation, reimbursement or indemnity which may now or hereafter accrue to the undersigned and any and all rights of recourse to or with respect to any assets or property of the Borrower or to any collateral for said liabilities." As a party to an individual guaranty to the bank, Nelson again agreed, in a boldface provision on the face of the guaranty, that his liability to the bank would "not be terminated by, and the undersigned assents to . . . any modification, waiver or amendment of the terms of any agreement relating to liabilities, any substitution, exchange or release of collateral." He therein acknowledged, furthermore, that the bank had "no duty to collect or protect any collateral or any income thereon, nor to preserve any rights against any other parties, and [that the bank could] proceed under this guarantee immediately upon borrower's default without resorting to or regard to any collateral or any other guarantee or source of payment." In these three different forms of guaranty, simultaneously executed for the benefit of the bank in order to induce it to extend credit to Jefferson Pine, Nelson manifested, definitively and unequivocally, his intent to waive any rights that he might have had as guarantor to challenge the bank's conduct with regard to the secured collateral.

---

[12] Section 8.1 of the loan and security agreement further provided that "[t]he bank shall have no duty . . . as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof. . . . No delay or omission on the part of the Bank in exercising any right shall operate as a waiver of such right or any other right. . . ."

Both the common law and the Uniform Commercial Code recognize that a guarantor may expressly waive his rights with respect to collateral that secures the debt that he has guaranteed. *Glazier* v. *Douglass,* 32 Conn. 393, 399 (1865); General Statutes § 42a-3-606 (1) (b); L. Simpson, Handbook on the Law of Suretyship (1950) § 72; 1 J. White & R. Summers, supra, § 13-17. Nelson has not alleged that he did not sign these documents or that he was uninformed about their contents. While a determination about a party's intent to waive his rights ordinarily poses a question of fact, clear and definitive contract language can establish waiver as a matter of law. *Pero Building Co.* v. *Smith,* 6 Conn. App. 180, 184, 504 A.2d 524 (1986); see also *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corporation,* 203 Conn. 123, 130–31, 523 A.2d 1266 (1987); *Sturman* v. *Socha,* 191 Conn. 1, 10, 463 A.2d 527 (1983).

Although this court has not had the occasion to consider the extent to which a guarantor may expressly waive claims relating to a secured creditor's alleged impairment of collateral, cases in other states uniformly recognize the enforceability of such a waiver if the language of guaranty is sufficiently specific. See, e.g., *Salter* v. *AmSouth Bank, N.A.,* 487 So. 2d 927, 929–30 (Ala. Civ. App. 1985); *First National Bank of Arizona* v. *Bennett Venture, Ltd.,* 130 Ariz. 562, 565–66, 637 P.2d 1065 (Ariz. App. 1981); *American Security Bank* v. *Clarno,* 151 Cal. App. 3d 874, 882–84, 199 Cal. Rptr. 127 (1984); *Sadler* v. *Trust Co. Bank of South Georgia, N.A.,* 178 Ga. App. 871, 872–73, 344 S.E.2d 694 (1986); *In re Estate of Williams,* 109 Ill. App. 3d 828, 833, 441 N.E.2d 412 (1982); *Kansas State Bank & Trust Co.* v. *DeLorean,* 7 Kans. App. 2d 246, 255–57, 640 P.2d 343 (1982); *Etelson* v. *Suburban Trust Co.,* 263 Md. 376, 379, 283 A.2d 408 (1971); *Federal Deposit Ins. Corporation* v. *Hill,* 13 Mass. App. 514, 518, 434 N.E.2d 1029 (1982); *Price* v. *First National Bank of the South,* 477

So. 2d 1340, 1342–43 (Miss. 1985); *Lemay Bank & Trust Co.* v. *Lawrence,* 710 S.W.2d 318, 322–23 (Mo. App. 1986); *Myers* v. *Bank of Niobrara,* 215 Neb. 29, 32–33, 336 N.W.2d 608 (1983); *American Bank of Commerce* v. *Covolo,* 88 N.M. 405, 409–10, 540 P.2d 1294 (1975); *Executive Bank of Fort Lauderdale* v. *Tighe,* 54 N.Y.2d 330, 336–39, 429 N.E.2d 1054, 445 N.Y.S.2d 425 (1981); *Lawyers Title Ins. Corporation* v. *Northeast Texas Development Co.,* 635 S.W.2d 897, 899 (Tex. App. 1982); *Continental Bank & Trust Co.* v. *Utah Security Mortgage, Inc.,* 701 P.2d 1095, 1098–99 (Utah 1985); *Schauss* v. *Garner,* 590 P.2d 1316, 1319–20 (Wyo. 1979). The cases to the contrary on which Nelson relies are distinguishable because the guaranties therein at issue contained no specific waivers of rights with regard to collateral. *Langeveld* v. *L.R.Z.H. Corporation,* 74 N.J. 45, 52–54, 376 A.2d 931 (1977); *Valley Bank & Trust Co.* v. *Rite Way Concrete Forming, Inc.,* 742 P.2d 105, 110 (Utah App. 1987). Given the specificity and breadth of the language contained in the guaranties to which Nelson subscribed, we conclude that his waiver of rights bars enforceability of any claims a guarantor might otherwise have for impairment of secured collateral.

Although we recognize that General Statutes § 42a-9-501 (3)[13] has a special antiwaiver provision concerning the disposition and redemption of secured collateral, and an accounting for its proceeds; see, e.g., *Wisconics Engineering, Inc.* v. *Fisher,* 466 N.E.2d 745, 762–64, 766–67 (Ind. App. 1984); *Dakota Bank & Trust*

---

[13] General Statutes § 42a-9-501 provides in relevant part: "DEFAULT; PROCEDURE WHEN SECURITY AGREEMENT COVERS BOTH REAL AND PERSONAL PROPERTY. . . . (3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral by subsection (3) of section 42a-9-504 and section 42a-9-505 and with respect to redemption of collateral by section 42a-9-506 but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured

*Co., Fargo* v. *Grinde,* 422 N.W.2d 813, 816–18 (N.D. 1988); that provision does not govern this case. By its own terms, § 42a-9-501 (3) concerns only disputes about the commercial reasonableness of the conduct of a secured creditor in possession of secured collateral. Our determination, earlier in this opinion, that the bank had neither actual nor constructive possession of Jefferson Pine's inventory forecloses the applicability of § 42a-9-501 (3). Numerous cases in other jurisdictions have held that a secured creditor has no duty to repossess when a guarantor has waived rights concerning impairment of collateral. See, e.g., *Salter* v. *AmSouth Bank, N.A.,* supra; *First National Bank of Arizona* v. *Bennett Venture, Ltd.,* supra; *Kansas State Bank & Trust Co.* v. *DeLorean,* supra; *Price* v. *First National Bank of the South,* supra; *Lemay Bank & Trust Co.* v. *Lawrence,* supra; *American Bank of Commerce* v. *Covolo,* supra, 408; *Continental Bank & Trust Co.* v. *Utah Security Mortgage, Inc.,* supra.

We conclude, therefore, that Nelson cannot prevail on his second and third special defenses because the guaranties that he signed expressly waived his right to assert any claims about the bank's alleged misconduct with respect to its security interest in Jefferson Pine's inventory. The trial court, accordingly, correctly granted the bank's motion to strike these defenses.

II

Nelson asked the court for permission to file a third revised and amended answer, special defenses, counter-

if such standards are not manifestly unreasonable: (a) Subsection (2) of section 42a-9-502 and subsection (2) of section 42a-9-504 insofar as they require accounting for surplus proceeds of collateral; (b) subsection (3) of section 42a-9-504 and subsection (1) of section 42a-9-505 which deal with disposition of collateral; (c) subsection (2) of section 42a-9-505 which deals with acceptance of collateral as discharge of obligation; (d) section 42a-9-506 which deals with redemption of collateral; and (e) subsection (1) of section 42a-9-507 which deals with the secured party's liability for failure to comply with this part."

claim and cross complaint on June 27, 1991. The chronology of the case to that date had included: the filing of the bank's complaint on June 21, 1988; the filing of Nelson's first answer, special defenses, setoffs and cross complaint on September 28, 1988; the filing of Nelson's second revised and amended answer, special defenses, counterclaim and cross complaint on November 30, 1989; and the partial granting of the bank's motion to strike on April 20, 1990. The bank's motion for summary judgment, filed December 24, 1990, had been denied on June 6, 1991. The case had been set down for a jury trial to begin on July 9, 1991.

In its review of Nelson's request for leave to amend, the trial court found that the amended pleading would have added lengthy new allegations of fact and law. While Nelson's earlier pleading had challenged the bank's refusal to approve a specific business plan, proposed by Jefferson Pine on April 28, 1988, that sought to facilitate future advances from the Phoenix Northeast Corporation, the amended pleading added allegations about the bank's refusal to approve a different plan, with a different company, on a different date. The court weighed the bank's objection that it would be prejudiced if a trial proceeded as scheduled without affording the bank an opportunity to explore the implications of Nelson's expanded new pleadings. Despite Nelson's contention that his factual contentions had been raised in his memorandum of law objecting to the bank's motion for summary judgment, the court denied the request to amend.

Our review of a trial court's denial of a belated request for amendment of the pleadings is limited to an inquiry into whether the trial court abused its discretion. "We have not previously found an abuse of discretion when a trial court, on the eve of trial, concluded that prejudice and delay would result from a substantial amendment to the [pleadings], and we decline to

do so in the present circumstances. *Beckman* v. *Jalich Homes, Inc.,* 190 Conn. 299, 302–303, 460 A.2d 488 (1983); *Lawson* v. *Godfried,* 181 Conn. 214, 216, 435 A.2d 15 (1980)." *Multi-Service Contractors, Inc.* v. *Vernon,* 193 Conn. 446, 453–54, 477 A.2d 653 (1984); see also *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 573–74, 512 A.2d 893 (1986). The trial court could reasonably have concluded that the bank had a right, in preparing its case for trial, to rely on the factual allegations contained in Nelson's pleadings rather than on the factual allegations contained in a memorandum of law. The court could equally have concluded that Nelson had had ample time to amend his pleadings after the granting of the motion to strike. The fact that the bank had thereafter filed a motion for summary judgment did not impair Nelson's ability to file a request, in timely fashion, for a further amendment to his pleadings. See Practice Book § 176.

The judgment is affirmed.

In this opinion the other justices concurred.