ALBANY INSURANCE CO., Plaintiff,

v.

**UNITED ALARM SERVICES, INC., et al., Defendants.**

**No. 3:00CV1193(AWT).**

United States District Court, D. Connecticut.

March 29, 2002.

Robert K. Marzik, Stratford, CT, Jamesf. Sweeney, III, Donovan, Parry, Carbin, McDermott & Radzik, New York City, Thomas M. Rittweger, Nicoletti, Hornig, Campise & Sweeney, New York City, for Plaintiff.

Thomas J. Hagarty, Jr., Laura Alexandra Pascale, Halloran & Sage, Hartford, CT, for United Alarm SVSC, Inc.

Cynthia Ann Jaworski, Law Offices of Grant H. Miller, West Hartford, CT, for Advanced Automatic Sprinker Protection, Inc.

Thomas M. Murtha, Maher & Murtha, Bridgeport, CT, for City of Danbury, Danbury Pub. Util. Dept., Danbury Water Dept., William Buckley, Paul Galvin, John Doe.

David A. Haught, Robert G. Clemente, Paul A. Croce, II, Cooney, Scully & Dowling, Hartford, CT, for Otto Contracting Co.

## RULING ON MOTION FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

The plaintiff, Albany Insurance Company ("Albany"), brought this action against United Alarm Services, Inc. ("UAS") and several other defendants, seeking reimbursement for a payment it made under an insurance policy. UAS has moved for summary judgment on two grounds. First, UAS contends that Albany's claims against it are barred by virtue of waiver provisions in the agreements between Albany's insured and UAS. Second, UAS contends that even if the waiver provisions are not enforceable, the plaintiff's recovery as to UAS must be limited to $250.00, as set forth in the liquidated damages clauses in those agreements. For the reasons set forth below, the defendant's motion is being granted based on UAS's first argument.

## I. FACTUAL BACKGROUND

On or about September 16, 1998, UAS entered into two written contracts with the Fairfield Processing Corporation ("Fairfield"). Each contract was for a term of three years. The first contract was a "Central Station Monitoring Agreement", which provided that in exchange for Fairfield's payment of a monthly fee of $17.50, UAS would monitor the fire alarm system at a warehouse owned by Fairfield and located in Danbury, Connecticut (the "Warehouse").

The second contract was a "Preventive Maintenance & Service Plans" agreement, which provided that UAS would "perform services to equipment/system" located at the Warehouse. Specifically, Fairfield signed up for "The Tune–Up" and "The Easy Sleeper" plans offered by UAS. Under "The Tune–Up" plan, UAS agreed to "[h]ave our trained technicians test and inspect your entire system, clean all security devices and document all poorly functioning components." Pl.'s Memo. Opp. Summ. J. ("Pl.'s Memo."), Ex. 3. Fairfield agreed to pay $125.00 per inspection for this service. Under "The Easy Sleeper" plan, UAS agreed to "return your system to its original working condition regardless of broken or damaged equipment." *Id.* Fairfield agreed to pay a monthly fee of $16.67 for this service.

Paragraph five of the Central Station Monitoring Agreement and paragraph four of the Preventive Maintenance & Service Plans agreement are identical, and contain, inter alia, a waiver by Fairfield of certain of its rights against UAS and a waiver, by Fairfield on behalf of its insurers, of any right of subrogation against UAS.

On July 5, 1999, a portion of a sprinkler main in the Warehouse became dislodged, causing water to flow into the Warehouse. Approximately 1.3 million gallons of water flooded the warehouse, damaging finished

goods stored there. Both of the agreements described above were in effect at the time of the flood.

The plaintiff, by virtue of a property insurance policy with Fairfield, paid Fairfield $715,930.96 for the property damage caused by the flood. Albany commenced this subrogation action against UAS and others in an effort to recoup its payment to Fairfield from the defendants.

## II. *LEGAL STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c) (2000). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Del. & Hudson*

*Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock*, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. If the nonmovant fails to meet this burden, sum-

mary judgment should be granted. The question then becomes: is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 248, 251, 106 S.Ct. 2505.

### III. DISCUSSION

The plaintiff's Second Amended Complaint contains 13 counts; the first six set forth claims against UAS. Counts One, Two and Three are claims for breach of contract, negligence and gross negligence and/or recklessness relating to the Central Station Monitoring Agreement. Counts Four, Five and Six are claims for breach of contract, negligence and gross negligence and/or recklessness relating to the Preventive Maintenance & Service Plans agreement. UAS raises as an affirmative defense to each of these claims the waiver provisions set forth in paragraph five of the Central Station Monitoring Agreement and paragraph four of the Preventive Maintenance & Service Plans agreement.[1] The plaintiff contends that the waiver provisions are unenforceable because they are ambiguous and also because they are against public policy.

 Under Connecticut law, a party to a contract may waive any defenses or rights it has against the other party to the contract, and such a waiver will be enforced if it is clear and unambiguous. *See Bialowans v. Minor*, 209 Conn. 212, 550 A.2d 637, 639–40 (1988) (waiver of right to file mechanics' lien); *City of New Haven v. Local 884, Council 4, AFSCME*, 237 Conn. 378, 677 A.2d 1350, 1354 (1996) (noting that "the general rule [is] that rights may be waived" by contract or by actions); *Conn. Nat'l Bank v. Douglas*, 221 Conn.

---

1. UAS also argues, in the alternative, that even if Albany has the right to seek reimbursement from UAS, the liquidated damages clauses set forth in the agreements limit the plaintiff's recoverable damages to $250.00. Because the court finds that the waiver provisions in the agreements are valid and enforceable, the court does not reach this issue.

530, 606 A.2d 684, 691 (1992) ("a guarantor may expressly waive claims relating to a secured creditor's alleged impairment of collateral"); *Hartford–Connecticut Trust Co. v. Clark–Barone Co.*, 21 Conn.Supp. 368, 154 A.2d 883, 885 (1959) (voluntary waiver of rights in a contract is not contrary to public policy, which supports freedom to contract).

■ The Connecticut Supreme Court recently commented on the approach that a court should take in determining whether a contract term is clear and unambiguous, as follows:

> In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. A contract is unambiguous when its language is clear and conveys a definite and precise intent. The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. Furthermore, a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature.

*United Illuminating Co. v. Wisvest–Connecticut, LLC*, 259 Conn. 665, 791 A.2d 546 (2002) (internal quotation marks and citations omitted).

■ A contractual waiver of subrogation rights is enforceable if, by this standard, the waiver is clear and unambiguous. In a case which is often cited by Connecticut courts in the context of subrogation actions, the Connecticut Supreme Court described subrogation as follows:

> Subrogation is a doctrine which equity borrowed from the civil law and administers so as to secure justice without regard to form or mere technicality.... It

is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience, should have been discharged by the latter. It is a legal fiction through which one, who not as a volunteer or in his own wrong, and where there are no outstanding and superior equities, pays the debt of another, is substituted to all the rights and remedies of the other, and the debt is treated in equity as still existing for his benefit.... Equity seeks by this action, as it does by that for reimbursement, contribution, and exoneration, to prevent the unearned enrichment of one party at the expense of another, by creating a relation somewhat analogous to a constructive trust in favor of the subrogee, or party making the payment, in all legal rights held by the creditor....

> There is no more reason to deny that the person claiming subrogation should have the benefit of the securities because there is not an agreement to that effect than there would be in the absence of some agreement for equity to refuse to enforce a constructive trust or to deny the right of the assignee of a debt to have the benefit of the security given for it. *The terms of the agreement between the parties might prevent the application of the remedy.* But the subrogation does not depend upon an agreement that the person claiming it should have the benefit of the security. The question here is whether in equity and good conscience the plaintiffs are entitled to priority in order to secure to them *the benefit which at least between the parties to the transaction it was agreed they should have.*

*Home Owners' Loan Corp. v. Sears, Roebuck & Co.*, 123 Conn. 232, 193 A. 769, 772–73 (1937) (emphasis added) (internal quotation marks and citations omitted).

Subrogation actions are often brought by insurers, as is the case here. In this context, subrogation is the right of the insurer to be put in the position of its insured so that it may pursue recovery from third parties who are legally responsible to the insured for a loss paid by the insurer. When an insurer brings a subrogation claim, the insurer's rights "are no different or more advantageous" than the rights of the insured, and the insurer "stands in [the insured's] shoes as to any waiver or estoppel" which could affect the rights of the parties. *Arton v. Liberty Mutual Ins. Co.*, 163 Conn. 127, 302 A.2d 284, 291 (1972). *See also Hanover Ins. Co. v. Fireman's Fund Ins. Co.*, 217 Conn. 340, 586 A.2d 567, 570 (1991) (noting that a subrogee insurer has "no greater rights" against a defendant than the insured possessed and is "equally subject to any defenses" that the defendant might have asserted against the subrogor); *KND Broadcasting Corp. v. Neiditz*, No. SCH–4240, 1984 WL 255653 (Conn.Super.Ct. May 18, 1984) ("[T]he general rule is that the subrogee stands in the shoes of its insured and can obtain no greater rights against a third person than its insured had.").

The Central Station Monitoring Agreement and the Preventive Maintenance & Service Plans agreement each contain two pertinent provisions. First, paragraph two of each of these agreements provides that Fairfield will obtain "insurance covering personal injury, including death, and real or personal property loss or damage in, about or to the premises." Pl.'s Memo. Ex. 2, Ex. 3. Second, each of these agreements contains a waiver provision. Paragraph five of the Central Station Monitoring Agreement and paragraph four of the Preventive Maintenance & Ser-

vice Plans agreement are identical and read as follows:

> Subscriber does hereby for him/her/itself and all parties claiming under him/her/it release and discharge Company from and against all hazards covered by insurance or bond, including all deductible and retained limits as well as loss or damage in excess of policy limits. It is expressly understood and agreed that no insurance company, insurer, or bonding company or their successors or assigns shall have any rights created by a Loan Agreement, Loan Receipt, or other like document or procedure, or any right of subrogation against Company.[2]

Pl.'s Memo. Ex. 2, Ex. 3.

The first sentence of this paragraph includes a waiver by Fairfield of its own rights to recover from UAS any damages arising from hazards covered by insurance—"Subscriber does hereby for … itself … release and discharge [UAS] from and against all hazards covered by insurance or bond …." Pl.'s Memo. Ex. 2, Ex. 3. Such a contractual waiver of rights is enforceable under Connecticut law. *See Maryland Cas. Co. v. The Trane Co.*, 46 Conn.Supp. 172, 742 A.2d 444, 445–46 (1999). The damage caused by the flood was covered by insurance, issued by Albany, so Fairfield has no right to recover from UAS for damages caused by the flood.

Under Connecticut law, Albany, as a subrogee, has no greater rights against UAS than its subrogor, Fairfield, has,

> The insurer's right of subrogation against third persons causing the loss paid by the insurer to the insured does not rest upon any relation of contract or

**2.** The term "subscriber" refers to Fairfield Processing Corporation and the term "company" refers to UAS.

privity between the insurer and such third persons, but arises out of the contract of insurance and is derived from the insured alone. Consequently, the insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. The principle has been frequently expressed in the form that the rights of the insurer against the wrongdoer cannot rise higher than the rights of the insured against such wrongdoer, since the insurer as subrogee, in contemplation of law, stands in the place of the insured and succeeds to whatever rights he may have in the matter. Therefore, any defense which a wrongdoer has against the insured is good against the insurer subrogated to the rights of the insured.... [A] subrogee can obtain no greater rights against a third person than its subrogor had. *Orselet v. DeMatteo*, 206 Conn. 542, 539 A.2d 95, 97–98 (1988) (internal quotation marks and citations omitted). Because as Fairfield's subrogor, Albany has no greater rights than Fairfield has, and Fairfield has waived its rights to recover from UAS for damages resulting from the flood, Albany also has no right to recover any such damages from UAS.

In addition, the first sentence of this paragraph includes a waiver by Fairfield of the rights of all parties claiming under it to recover from UAS for any damages arising from hazards covered by insurance—"Subscriber does hereby for ... all parties claiming under ... it release and discharge [UAS] from and against all hazards covered by insurance or bond ...." Pl.'s Memo. Ex. 2, Ex. 3. Furthermore, some parts of what is stated implicitly in this portion of the first sentence are stated expressly in the second sentence. The pertinent language in that second sentence is that "[i]t is expressly understood that no insurance company, insurer or bonding company ... shall have ... any right of

subrogation against [UAS]." Pl.'s Memo. Ex. 2, Ex. 3. Thus, this is a situation where the terms of the agreement between Fairfield and UAS prevent the exercise of the equitable remedy of subrogation by any person who would otherwise have subrogation rights against UAS. The language in *Home Owners' Loan Corp.* makes it clear that such terms in an agreement are enforceable. *See Home Owners' Loan Corp.*, 193 A. at 773 ("The terms of the agreement between the parties might prevent the application of the remedy."). *See also Farmington Cas. Co. v. Williams Real Estate Co.*, 1999 WL 734935 (S.D.N.Y. Sept.20, 1999), *aff'd*, No. 99–9267, 2000 WL 1186006 (2d Cir. Aug.21, 2000) (finding valid and enforceable a waiver of subrogation clause contained in a lease agreement between the plaintiff's insured and the defendants); *Tokio Marine and Fire Ins. Co. Ltd. v. Employers Ins. of Wausau*, 786 F.2d 101, 104–05 (2d Cir.1986) (upholding waiver of subrogation clause in a construction contract).

Giving the words of the two agreements their natural and ordinary meaning, the court concludes that the language is clear, and also that the language conveys a definite and precise intent that no insurer have any rights of subrogation against UAS. The plaintiff argues, however, that the waiver provision is ambiguous for two reasons.

▆▆▆ First, Albany contends that the language in paragraph two of each of the agreements, which requires Fairfield to obtain "insurance covering personal injury, including death, and real or personal property loss or damage in, about or to the premises", makes it unclear whether the waiver provision applies only when there is a tort claim or also applies when a claim is brought for breach of contract. However, Albany bases this argument on the premise that the term "hazards covered by in-

surance", which is used in the waiver provision, is defined in paragraph two of the agreement. That term is not defined there. Also, Albany's argument is, in substance, that both the insurance provision and the waiver provision are to be understood in terms of the type of claim involved, and that is not so. The insurance provision refers only to the type of injury, loss or damage that must be covered and does not include any limitation based on the nature of the claim Fairfield would have. Finally, looking at the plain language of the waiver provision, there is no indication that the parties intended to limit the scope of the waiver provision in the manner suggested by Albany. The waiver provision states that Fairfield discharges UAS "from and against *all* hazards covered by insurance", and that "*no* insurance company ... shall have ... *any* right of subrogation" against UAS. Pl.'s Memo. Ex. 2, Ex. 3 (emphasis added). There is no basis in the language of the waiver provision for distinguishing between those situations where Fairfield has a contract claim and those where it has a tort claim. The cases relied on by Albany, *St. Paul Fire and Marine Ins. Co. v. Protection Mutual Ins. Co.,* 644 F.Supp. 38 (S.D.N.Y.1986), and *Viacom Int'l, Inc. v. Midtown Realty Co.,* 193 A.D.2d 45, 602 N.Y.S.2d 326 (N.Y.App.Div.1993), are inapposite because they involve contract language that is different in material respects.

The plaintiff also argues that the waiver provision is ambiguous because "it is ambiguous whether insurance was to be procured for the benefit of both parties." Pl.'s Memo. at 8. This question is immaterial because there is no basis in the language of the waiver provision for determining the scope of the waiver based on whether insurance was to be procured for the benefit of both parties or for the benefit of only one of them.

■■■■ Finally, Albany argues that the waiver provision in paragraph five of the Central Station Monitoring Agreement and paragraph four of the Preventive Maintenance & Service Plans agreement violates public policy. Albany relies on Conn. Gen.Stat. § 52–572k, which provides, in pertinent part:

> Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

Conn. Gen.Stat. § 52–572k(a) (West 2002). However, § 52–572k is inapplicable to this case for at least two reasons. First, § 52–572k applies only to construction contracts. The Connecticut Supreme Court has held that in construing a statute, "the title of the legislation is an aid to statutory construction." *P.X. Restaurant, Inc. v. Town of Windsor,* 189 Conn. 153, 454 A.2d 1258, 1261 (1983). The title of § 52–572k is: "Hold harmless clause against public policy in certain construction contracts". This title clearly suggests that application of the statute was intended to be limited to construction contracts. "The legislature, in specifically outlawing hold harmless agreements in the construction industry, showed an intention that such a practice not be deemed against public policy in other situations, for had the legislature

intended to outlaw all such provisions as against public policy, it could have said so." *Burkle v. Car and Truck Leasing Co., Inc.,* 1 Conn.App. 54, 467 A.2d 1255, 1257 (1983).[3]

Second, § 52–572k governs only those contracts "entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto". The plaintiff argues that the contracts at issue here concern the Warehouse's sprinkler system, and that the sprinkler system is an appurtenance to the Warehouse. An appurtenance is defined as "[a]n article adapted to the use of the property to which it is connected and which was intended to be a permanent accession to the freehold." Black's Law Dictionary 103 (6th Ed.1990).

 The plaintiff has not provided any Connecticut precedent supporting its contention that a sprinkler system is an appurtenance within the meaning of this statute, but even assuming that a sprinkler system is an appurtenance, the contracts at issue here concern an alarm system, not a sprinkler system. Also, the Central Station Monitoring Agreement clearly states that title to all equipment associated with the alarm system remained with UAS unless sold and fully paid for, and that UAS reserved the right to remove and disconnect the equipment in the event of a default in payment by Fairfield. *See* Pl.'s Memo. Ex. 2 ¶ 7. Thus, the alarm system was not intended to be a permanent part of the real property, and is not an appurtenance.

Finally, the court notes that this analysis is consistent with that of courts in New York. Under New York law, "[s]prinkler systems may legitimately be considered appurtenances of real property ... whereas it has been held that contracts for installing and maintaining alarm systems are not contracts affecting real property or for services rendered in connection with construction, maintenance and repair of real property within the meaning of" a New York law similar to § 52–572k. *Antical Chems., Inc. v. Westinghouse Sec. Sys., Inc.,* 86 A.D.2d 768, 448 N.Y.S.2d 279, 282 (1982) (internal quotation marks and citations omitted). *See also El Chami v. Automatic Burglar Alarm Corp.,* 106 Misc.2d 559, 434 N.Y.S.2d 330, 331 (1980) (acknowledging case law holding that a sprinkler system is an appurtenance but stating that an alarm system is not an appurtenance).

For these reasons, the court finds that § 52–572k does not apply to this case, and it is not a basis for denying the defendant's motion for summary judgment.

## IV. CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment [Doc. # 43] is hereby GRANTED.

The Clerk shall terminate United Alarm Services as a defendant in this case.

It is so ordered.

---

**3.** The Connecticut legislature has adopted several statutes dealing with alarm systems. Had the legislature intended § 52–572k to apply to contracts for monitoring or maintaining alarm systems, it could have specifically included such systems in the statutory language.