NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0933n.06

No. 13-6646

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 17, 2014
DEBORAH S. HUNT, Clerk

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Tennessee Commerce Bank,

  Plaintiff-Appellee,

    v.

ANTHONY W. THORNTON,
ELIZABETH THORNTON, and
BOWLING GREEN FREIGHT, INC.,

  Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

**BEFORE:** COOK and WHITE, Circuit Judges; and MICHELSON, District Judge.[*]

  **MICHELSON, District Judge**. This appeal is not about whether liability exists but about the amount of liability. Appellant Bowling Green Freight, Inc., and two of the company's owners, Appellants Elizabeth Thornton and Anthony W. Thornton, appeal the district court's award of approximately $135,000 to Appellee Federal Deposit Insurance Corporation for Bowling Green Freight's undisputed default on a commercial loan. Bowling Green Freight and the Thorntons say that the judgment should have been under $15,000. The primary basis for their assertion is an $80,000 check that Bowling Green Freight wrote to Tennessee Commerce Bank, the loan originator. The district court found that Appellants failed to show that Tennessee Commerce Bank received the funds from the check, and even if it did, that the payment was

---

  [*] The Honorable Laurie J. Michelson, United States District Judge for the Eastern District of Michigan, sitting by designation.

intended to apply to the one defaulted loan at issue at trial, as opposed to the other three loans that Bowling Green Freight had with Tennessee Commerce Bank. We think that, on the evidence presented at trial, the first finding was clearly erroneous. And the alternative holding does not comport with Tennessee law. For this and other reasons provided below, we reverse in part, affirm in part, and remand.

## I.

## A.

In 1985, Elizabeth and Anthony Thornton capitalized on the fact that General Motors had its Corvette plant in Bowling Green, Kentucky, by starting Bowling Green Freight, Inc. ("BGF")—a trucking company that transports Corvette parts. At one point, the company's revenue exceeded $22 million per year. But General Motors' financial difficulties during the recent economic downturn resulted in BGF's revenue falling to only $9 million per year. That unanticipated sixty-percent reduction in business made it hard for BGF to keep up with the financial commitments it had already made. This case arises from BGF's failure to timely repay four loans with Tennessee Commerce Bank ("TCB").

Three of these four loans are not directly at issue on appeal, but relate to the one loan that is at issue. One loan started as a series of leases that BGF entered into with non-party American Lease Plans. After American Lease Plans assigned its interests in the leases to TCB, TCB bundled the leases into a single loan, "the 184900 Loan." As of late 2010, the amount owed on the 184900 Loan exceeded $6 million. In May 2010, BGF borrowed $61,500 from TCB, promising to repay the bank in full and with interest by July 21, 2010 ("the 18107 Loan"). The Thorntons each executed a "Commercial Guaranty" securing the 18107 Loan. Those stated in part, "Guarantor [Anthony/Elizabeth Thornton] absolutely and unconditionally guarantees full

and punctual payment and satisfaction of the Indebtedness of [Bowling Green Freight] to [Tennessee Commerce Bank] . . . ." In June 2010, BGF took out a third loan from TCB, borrowing $121,450 and agreeing to repay that amount with interest by August 5, 2010 ("the 18224 Loan"). As with the 18107 Loan, Elizabeth and Anthony each guaranteed the 18224 Loan.

Directly at issue on appeal is a fourth loan, "the 18092 Loan," executed on May 17, 2010. The first promissory note associated with the 18092 Loan reflects that BGF borrowed $171,500 and promised to repay TCB with interest by July 17, 2010. As collateral, BGF granted TCB a security interest in "all" of its "inventory, Chattel Paper, Accounts, Equipment and General Intangibles." Anthony Thornton also granted TCB a security interest in over 4,200 shares of stock he owned. And both Elizabeth and Anthony further secured BGF's promise to repay by each executing a commercial guaranty very similar to those associated with the 18107 Loan and the 18224 Loan.

BGF did not fully repay the 18092 Loan by the July 17, 2010 maturity date. On that day, BGF and TCB executed a second promissory note permitting BGF to repay the $115,204.16 remaining principal balance on the 18092 Loan, with interest, by November 5, 2010 ("the 18092 Note").

On July 28, 2010, with all 4 loans outstanding, Elizabeth Thornton wrote an $80,000 check to TCB that is at the heart of this appeal. The check was made payable to TCB and the corresponding funds were withdrawn from BGF's checking account the very day that Elizabeth signed the check. But Elizabeth did not direct the $80,000 payment to a particular loan. And the check was not endorsed—by TCB or otherwise. Nor did TCB ever apply the purported payment to any of the four loans.

The due date for payment under the 18092 Note, November 5, 2010, came and went without BGF repaying all that it owed TCB. As of that date, BGF had also failed to repay the other three loans.

Thus, on December 30, 2010, BGF and TCB entered into a forbearance agreement that applied to all four loans. The forbearance agreement stated that as of December 29, 2010, a balance over $6 million, and principal balances of $62,000 and $121,950, were outstanding on the 184900, 18107, and 18224 Loans, respectively. Similarly, for the 18092 Loan, the forbearance agreement stated: "Principal Balance: $115,204.16 (as of 12/29/10)." Under the forbearance agreement, BGF "acknowledge[d] that one or more events of default exist[ed] in respect to" all four loans and that TCB had the "legal and contractual right to pursue all its available rights and remedies in respect to" those loans, and that BGF had no claims or defenses to TCB's right to pursue its various remedies. For its part, TCB agreed to "forbear from immediately pursuing its rights and remedies, made available to [TCB] as a result of the respective defaults by [BGF]" until February 28, 2011.

The parties twice amended the forbearance agreement. On March 30, 2011, BGF and TCB agreed to extend the forbearance period from February 28 to April 28, 2011, and then, on May 31, 2011, the parties further extended the forbearance period to July 5, 2011, with BGF agreeing to make three interim payments (totaling a small fraction of the total debt). The twice-amended forbearance agreement provided that the agreement would "expire and terminate" on July 6, 2011, with TCB then "hav[ing] no further duty to forbear from exercising any rights or remedies otherwise available to [TCB] by virtue of the prior Defaults."

BGF did not pay the amounts owed on the four loans on or before July 5, 2011. Litigation followed.

**B.**

In January 2012, Tennessee Commerce Bank sued Bowling Green Freight in Tennessee Chancery Court for breach of contract, claiming that BGF had not fulfilled its obligations under the terms of the 184900, 18107, 18224, and 18092 Loans. TCB further claimed that Elizabeth and Anthony Thornton breached the commercial guaranties they executed in connection with the 18107, 18224, and the 18092 Loans.

The very day it filed suit, TCB was placed into receivership with the Federal Deposit Insurance Corporation ("FDIC"). BGF and the Thorntons then removed the action to the district court. In March 2012, the FDIC sought to intervene, claiming that it "st[ood] in TCB's shoes for purposes of this matter." In April 2012, the district court substituted the FDIC as plaintiff.

Considerable motion practice ensued—but not between TCB and the FDIC. In January 2013, WM Capital Partners, LLC—which had intervened after the FDIC sold it the 184900, 18107, and the 18224 Loans—sought to add a new claim: that the Thorntons had breached guaranties on the 184900 Loan, the loan with the $6 million balance. The motion was denied, but the court permitted WM Capital Partners to dismiss its case without prejudice. WM Capital Partners was initially a party to this appeal, but it since settled its claims with BGF and the Thorntons. Thus, the 184900, 18107, and the 18224 Loans are not directly before us.

The Thorntons, BGF, and the FDIC proceeded to a bench trial regarding the 18092 Loan. The district court found that the forbearance agreement "clearly demonstrate[d] BGF's acknowledgment that it was in default" on the 18092 Loan at the time the parties executed the forbearance agreement. The court further found that the Thorntons were liable for the 18092 Loan "in accordance with their obligations under the" two commercial guaranties. These findings are not challenged on appeal.

BGF and the Thorntons instead challenge three of the district court's findings establishing the amount of their liability. First, the district court rejected BGF and the Thorntons' defense of payment based on the $80,000 check. The court reasoned that BGF and the Thorntons, "by failing to present any records of TCB showing the $80,000 was actually received by it, . . . failed to prove by a preponderance of the evidence that the $80,000 at issue was, in fact, transmitted to TCB." The court further found that, even if TCB had received the payment, BGF and the Thorntons had "failed to present any evidence to show this payment was intended to apply to the sole loan at issue in this case, rather than any of the other three TCB loans outstanding at that time." As such, the district court found that the principal balance on the 18092 Loan was $99,863.42. Second, the trial court found that the FDIC was entitled to two late charges because BGF first failed to pay the 18092 Loan within fourteen days of the due date set in the second promissory note (November 20, 2010) and then failed to pay the loan off within fourteen days of the twice-extended forbearance period (July 20, 2011). The two late charges totaled $11,513.18. Third, based on a provision in the promissory note, the district court found that the FDIC was entitled to a higher interest rate following BGF's second purported default in July 2011, and, therefore, BGF and the Thorntons were liable for a total of $23,345.90 in interest. In all, the district court entered a $134,722.50 judgment in favor of the FDIC.

BGF and the Thorntons believe that each of these three findings is error and, once corrected, their liability is less than $15,000.

## II.

"In an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo.*" *T. Marzetti Co. v. Roskam*

*Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012). "Mixed questions of law and fact are also subject to *de novo* review." *Id.*

## III.

## A.

BGF and the Thorntons primarily appeal the district court's decision to not reduce their liability by $80,000 based on the July 28, 2010 check that Elizabeth Thornton wrote to TCB for that amount. Their argument proceeds this way: (1) contrary to the district court's finding, the "only rational conclusion possible under the facts and law" was that TCB received the $80,000 payment, (2) because neither BGF nor TCB directed the payment to any particular loan, Tennessee law required the district court to decide which of the four loans was most onerous on BGF and the Thorntons and apply the payment to that loan, and (3) the 18092 Loan was the most burdensome on them. Based on our review of the record below and Tennessee law, we agree with Appellants' first two points; we leave the third for the district court to decide in the first instance.

## 1.

BGF and the Thorntons' burden below was to show—by a mere preponderance—that TCB received $80,000 as a result of the check that Elizabeth Thornton wrote in July 2010. Most of the evidence introduced at trial favored Appellants' position. The check was made payable to TCB and it was not uncommon for BGF's payments to be hand delivered to TCB employees. And here, the very day that Elizabeth wrote the check, $80,000 was taken from BGF's bank account. There was no evidence of how another entity might have cashed a check made payable to TCB when it was not endorsed to another party. Further still, Elizabeth Thorntons' uncontroverted testimony was that on at least one prior occasion, TCB received funds on an

unendorsed check that BGF made payable to TCB. All of this was more than enough for BGF and the Thorntons to demonstrate that—more likely than not—it was TCB, not some still unknown entity, that received the $80,000 drawn from BGF's account on July 28, 2010.

But the foregoing evidence was not all that was introduced at trial on the payment-receipt issue. In particular, the loan balances set forth in the forbearance agreement, signed by BGF and the Thorntons months after the purported payment, did not reflect an $80,000 payment. While this fact weighs in favor of the FDIC's claim that TCB did not receive the $80,000 drawn on BGF's bank account, it does so only slightly. As Appellants' argue, the forbearance agreement may not have reflected the $80,000 payment not because TCB did not receive the funds, but because TCB failed to credit the funds it received to any of the four loans.

The district court misunderstood Appellants' argument, although they are partly to blame for the confusion. At trial, they argued:

> The FDIC is obviously trying to use this forbearance agreement so as not to have to credit Bowling Green Freight with the $80,000 check. To the extent that they're claiming that the parties intended that this document accurately reflect the outstanding balances as of the time the document was executed, our position, Your Honor, is that there was a mistake; that there was an $80,000 payment that was unaccounted for in these numbers, and that both Tennessee Commerce Bank and Bowling Green Freight made a mutual mistake of fact in preparing these numbers.

Indeed, Elizabeth Thornton testified, "I can't truthfully say that I knew that each one of these notes [in the forbearance agreement] were the exact amount. I can't truthfully say that. I trusted them to do their job. And that's my extent of it." These comments led the FDIC to file a post-trial motion to strike, which, quite reasonably, we think, characterized Appellants' trial argument as raising the affirmative defense of mistake of fact: "At the trial of this matter, Defendants attempted to make an argument that the subject Forbearance Agreement did not accurately reflect the outstanding balances owed upon the various notes due to there being a mistake." This

in turn led the district court, in granting the FDIC's motion to strike, to say that it was "unable to observe the distinction Defendants attempt to define between a defense of mistake and the relief requested here. Defendants are apparently asking the Court to distinguish between the balance *due* on Defendants' promissory note at the time they signed the Forbearance Agreement, and the amount Defendants *actually owed* on the same note based on payments previously made." Having agreed with the FDIC's characterization of BGF and the Thorntons' argument, the district court found that because BGF and the Thorntons failed to adequately plead the affirmative defense of mistake in their answer to the complaint, they were barred from arguing "that TCB erred in calculating the payments made on the [18092] Note leading up to the Forbearance Agreement."

Although BGF and the Thorntons did not accurately state their argument regarding the balances set forth in the forbearance agreement at trial, they did in subsequent briefing. In Appellants' proposed findings of fact and conclusions of law submitted to the court after trial, they unambiguously stated: "The outstanding balance listed in the Forbearance Agreement for each Note *correctly stated the balance for each Note*, but TCB also held $80,000 from BGF which had not yet been applied to reduce the balance of any specific Note." (Emphasis added.) And Appellants were equally unequivocal in their response to the FDIC's motion to strike: "As shown by the testimony at trial, *no one disputes that the balance on Note 18092 was anything other than $115,204.16 on that date*—but it is also undisputed that the FDIC-R's predecessor in interest had not yet applied an $80,000 payment that had been made on July 28, 2010." (Emphasis added.) Thus, it was BGF and the Thorntons' position below, as it is now, that the forbearance agreement balances were not mistaken, but correct given that TCB had not appropriated the $80,000 payment to any of the four loans. And we respectfully disagree with the

district court that the "only" explanation for this non-appropriation was an unenforceable side agreement between BGF and TCB to hold the payment as a credit. Neither party ever claimed that an unwritten side agreement existed. Error on the part of TCB is as likely an explanation for the failure to credit the payment to any of the loan balances.

Given this equally plausible explanation for the forbearance agreement failing to reflect the $80,000 payment, the evidentiary value of the loan balances set forth in that agreement is not great. And with the contrary evidence demonstrating payment, we find that the district court clearly erred in concluding that BGF and the Thorntons failed to show by a preponderance that TCB received the $80,000 payment.

**2.**

Under Tennessee law, where neither debtor nor creditor directs a payment to one of several loans between the parties, the court determines to which loan the payment should apply:

> The general rule in respect to the appropriation of payments is, that a debtor, owing different debts to the same person, has the right to apply the payment, at the time when made, to either; but, if he fails to do so, and the payment be general, the creditor may apply it; and where no appropriation is made by either party, the law will apply it according to the intrinsic justice and equity of the case.

*Bussey v. Gant's Adm'r & Heirs*, 29 Tenn. 238, 241 (1849) (citing Chitty on Contracts 752 n.1 (5th Am. ed. 1842)); *see also Blackmore v. Granbery*, 39 S.W. 229, 230 (Tenn. 1897) (stating that Tennessee law was in accord with the civil-law rule that "[i]f both [debtor and creditor] omit [the appropriation of payment], the law will apply the payments, according to its own notions of justice"). The Tennessee Supreme Court further provided that the court is to apply the debtor's payment to the loan that "lie[s] heaviest on the debtor." *Bussey*, 29 Tenn. at 242. Thus, Tennessee follows the civil-law rule where, for instance, "payments will be applied to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety, on the

principle that the debtor's honor is more concerned in debts on which he has given surety than in those where he alone is bound; and to an old debt before a new one." *Blackmore*, 39 S.W. at 230.

The FDIC says that in *Southern Construction Co. v. Halliburton*, 258 S.W. 409 (Tenn. 1924), the Tennessee Supreme Court rejected the "old doctrine" of the civil law that required "application [of a payment] to debts for which the debtor has given a personal surety." The FDIC reads *Halliburton* too broadly. There, a 1917 Tennessee statute regulating highway construction made materialmen "objects of special protection," so the Tennessee Supreme Court declined to "extend[]" the priority rule such that a subcontractor's payment on a debt owed to its materialmen would be first applied to the subcontractor's debts backed by the general contractor and its surety to the prejudice of the materialmen. *Id.* at 415; *see also id.* at 412. *Halliburton* did not abrogate the generally applicable rules for appropriating a payment to one of several debts set forth in *Bussey* and *Blackmore*.

**3.**

BGF and the Thorntons assert that the district court should have applied the $80,000 payment to the 18092 Loan because it weighed "heaviest" on them. They explain, "Of the three smaller notes, it carried the largest initial principal balance. . . . In addition, not only did BGF pledge over 4,000 shares of bank stock and all of its inventory, chattel paper, accounts, equipment, and general intangibles to secure the loan, . . . but Mr. and Mrs. Thornton executed personal guaranties as well . . . ." Their argument continues, "The debt [on the 18092 Loan] thus implicated both mortgaged security and the liability of individual surety, the two factors most prominently identified by Tennessee precedent as marking the 'heaviest' loan to which payments should be first directed." BGF and the Thorntons thus conclude, "The District Judge should have applied the $80,000 payment to Loan 18092 as Defendants requested."

We are skeptical. The plain language of the commercial guaranties, commercial pledge agreement, and commercial security agreement executed in connection with the 18092 Loan seems to say that everything that BGF and the Thorntons promised to back the 18092 Loan they also promised to back the 184900, 18107, and 18224 Loans. Indeed, when we asked Appellants for supplemental briefing on this issue, they could not meet the plain language of the agreements on its terms, instead invoking a number of ancillary arguments. If the security agreements and guaranties executed with the 18092 Loan also secured the 184900 Loan, it becomes significant that the 184900 Loan had a balance fifty times greater than that of the 18092 Loan.

Nonetheless, we leave Appellants' claim that the 18092 Loan weighed heaviest for the district court to address in the first instance. We do so for two reasons. First, although the contract language is plain, other issues complicate the analysis. In response to our request for supplemental briefing, Appellants explained that the FDIC did not argue below that collateral and guaranties backing the 18092 Loan also backed the other three loans, and, therefore, the FDIC waived the argument. And while there is language in the two security agreements associated with the 18092 Loan that could be read as also collateralizing the other three loans, the FDIC's supplemental brief does not advocate that reading. Further, during the pendency of this appeal, BGF and the Thorntons settled their dispute with WM Capital Partners, LLC—the company to which the FDIC assigned the 184900, 18107, and 18224 Loans. This leaves only the 18092 Loan presently in controversy and complicates the application of Tennessee law.

Second, we remand because the district court failed to apply Tennessee law as set forth in *Bussey* and *Blackmore*. Instead of determining which of the four loans weighed heaviest on BGF and the Thorntons, the court found dispositive that Appellants "failed to present any evidence to show this payment was intended to apply to the sole loan at issue in this case, rather than any of

the other three TCB loans outstanding at that time." Generally, it is our practice to review the trial court's determinations, not make new ones. *See Snow Pallet, Inc. v. Clinton Cnty. Indus. Dev. Auth.*, 46 F. App'x 787, 791 n.1 (6th Cir. 2002); *Luciani v. Schiavone*, 210 F.3d 372 (table), 2000 WL 331974, at *6 (6th Cir. 2000); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.").

**B.**

BGF and the Thorntons also appeal the district court's conclusion that they owed the FDIC two late charges of $5,760.20 and $5,752.98 totaling $11,513.18—they say they are only liable for one. A clause in the 18092 Note provides that if BGF made "a payment" more than two weeks "late," BGF would have to pay TCB a late charge of five percent of the scheduled payment. Reading this clause in conjunction with the forbearance agreement, the trial court concluded that the late-charge clause applied on November 20, 2010, fifteen days after the payment due date set in the second promissory note, and it again applied on July 21, 2011, fifteen days after the expiration of the twice-extended forbearance period. BGF and the Thorntons say that this was error because the forbearance agreement in no way modified the agreements associated with the 18092 Loan. More specifically, they say that the forbearance agreement did not "create . . . a new triggering date for the late charge." Examining the issue de novo, *see Dick Broad. Co.*, 395 S.W.3d at 659, we agree with Appellants.

At the time BGF and TCB executed the second promissory note, the parties contemplated only one payment, with one due date for that payment. The term "late" referred to only that date. These findings are dictated by the note's plain language taken in context. *See Bickford*, 377 S.W.3d at 664. The 18092 Note provides, "LATE CHARGE. If a payment is 15 days or

more late, Borrower will be charged 5.000% of the regularly scheduled payment." "Late" is a relative term and, at the time the 18092 Note was executed, the only plausible reference point was the due date set in the note. That date was November 5, 2010: "PAYMENT. Borrower will pay this loan in one principal payment of $115,204.16 plus interest on November 5, 2010. This payment due on November 5, 2010, will be for all principal and all accrued interest not yet paid." Thus, under the 18092 Note, the payment, "$115,204.16 plus interest," was "due on November 5, 2010," and only if BGF did not make the payment by that date, was its payment "late."

So the question becomes whether the term "late" can also refer to the due date set in the forbearance agreement. We think the plain language of the forbearance agreement answers the question in the negative. The forbearance agreement was not in the parties' contemplation at the time they agreed to the late-charge provision in the 18092 Note. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."). So the term "late" can only reference the due date set in the forbearance agreement if the forbearance agreement somehow modified the 18092 Note. But the forbearance agreement did not. It defined "Deferred Payments" to include any payments that BGF would have been required to make under its four loans with TCB absent TCB's agreement to forbear. The forbearance agreement then set a deadline for BGF to make these payments: "All Deferred Payments shall be due and payable in full at the expiration of the Forbearance Period . . . ." Although this set a new due date for BGF to pay what it owed on the 18092 Loan, nothing in the language modified the term "late" in the 18092 Note. True, BGF's failure to pay by the end of the forbearance period meant that it was again late—but late under the forbearance agreement, not the promissory note. As such, we conclude that the district erred in finding that fifteen days

after the forbearance period expired, the late-charge provision of the 18092 Note was again triggered.

The FDIC presents a number of textual arguments allegedly contrary to this conclusion. None persuade. The FDIC points out that the "PAYMENT" provision in the 18092 Note uses the plural "payments" rather than singular "payment": "Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal, then to . . . ." But, as quoted above, that very provision provides that the parties only ever contemplated one payment: "Borrower will pay this loan in *one* principal *payment* of $115,204.16 plus interest on November 5, 2010. This *payment* due on November 5, 2010, will be for all principal and all accrued interest not yet paid." (Emphases added.) The use of the plural "payments" in the clause describing how TCB will apply payments is insufficient to create an ambiguity in view of clear language calling for only one payment. *See Bickford*, 377 S.W.3d at 664 ("[A] strained construction may not be placed on the language used to find ambiguity where none exists" (internal quotation marks omitted)).

The FDIC also points out that the default provision of the 18092 Note uses the phrase "any payment." Although "any" standing by itself does not exclude a particular payment, the word must be read in context. *Bickford*, 377 S.W.3d at 664. The default provision more completely provides that a default occurs if "Borrower fails to make any payment when due *under this Note*." (Emphasis added.) This explicitly excludes a failure to pay pursuant to another agreement.

Accordingly, we find that the district court erred in concluding that BGF and the Thorntons are liable for two late charges.

**C.**

BGF and the Thorntons also appeal the district court's award of $8,466.20 in default-rate interest under the following provision of the 18092 Note: "Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 4.000 percentage points." Appellants say that the trial court should not have awarded the FDIC the higher, post-default interest rate because the FDIC waited until trial to include that amount in its damages calculations—a point that the FDIC concedes. BGF and the Thorntons argue that Federal Rule of Civil Procedure 26 required the FDIC to disclose its claim for default-rate interest much earlier in the litigation, and Rule 37 "expressly prohibited [the FDIC] from recovering damages not so disclosed . . . ." They say that contrary to Rule 37, the district court made "no determination that the failure to comply with Rule 26 was either substantially justified or harmless," and, therefore, the trial court's award of the default-rate interest was a "per se abuse of discretion."

This argument does not warrant reversal of the district court's award of default-rate interest. Rule 37 does not require preclusion of evidence where the failure to make the Rule 26 disclosure "is harmless." Fed. R. Civ. P. 37(c)(1). The FDIC's omission plainly was harmless. It is true that the FDIC's Rule 26 damage disclosures were based on the standard (as opposed to the default) rate of interest, and its complaint explicitly calculated interest based on the standard rate. On the other hand, BGF and the Thorntons acknowledge that "the documents showing [the FDIC's] entitlement to [default-rate] damages were . . . disclosed and known to [them]." And the default-rate interest provision is clear on its face: "Upon default . . . the interest rate on this Note shall be increased by 4.000 percentage points." Moreover, BGF and the Thorntons were given the opportunity to present any substantive argument as to why they were not required to pay the default-rate interest in their proposed findings of fact and conclusions of law submitted to the

district court after trial. Instead of doing so, they elected—in a footnote—to assert that the FDIC failed to comply with Rule 26. Indeed, even here BGF and the Thorntons present no substantive argument as to why the plain language of the promissory note, which was in their possession during the entirety of the litigation, does not require them to pay the default-rate interest. In these circumstances, we decline to reverse the district court's award of default-rate interest.

**D.**

BGF and the Thorntons assert that trial was "marred by unfair procedural irregularities." Before turning to the merits, we note that their argument includes unwarranted attacks on the district judge. As we have previously said, "a party should think twice about questioning the district court's integrity . . . . [E]ven in the worst cases, the better practice is usually to lay out the facts and let the court reach its own conclusions." *Big Dipper Entm't, L.L.C. v. City of Warren*, 641 F.3d 715, 719 (6th Cir. 2011).

As for the merits, BGF and the Thorntons have not shown that the procedures used at trial warrant reversal. Appellants say that the district court disregarded the Federal Rules of Evidence and engaged in rule-making reserved to the Supreme Court by admitting all evidence but permitting the parties, after trial, to move to strike anything they thought was inadmissible. But BGF and the Thorntons have not identified any prejudice they suffered from this procedure. They do point out that the district court did not allow them to proceed on one line of questioning of David Ohlrich, the FDIC's witness; but what they sought to establish in that line of questioning—that TCB did not apply the $80,000 payment to any of the four loans—the district court found in their favor: "Ohlrich . . . testified that none of BGF's four loans were credited for a payment of $80,000 on our around July 28, 2010."

BGF and the Thorntons also argue that, during the pretrial conference, of which we have no transcript to review, the district court denied the FDIC's pending motions in limine, but, after trial, concluded that the motions were not denied but deferred. Again, we see no prejudice. Appellants say they would have filed responses to the pending motions if they had known that they were merely deferred (they did not, they say, because they wanted to avoid "clutter[ing]" the docket). But the district court later denied all six of the FDIC's motions in limine. Thus, no response was ultimately the best response.

In short, BGF and the Thorntons have not shown that the trial procedures were prejudicial to them.

**E.**

Finally, we turn to BGF and the Thorntons' prevailing-party claim. We have agreed with Appellants' claim that the forbearance agreement did not modify the promissory note such that Appellants owed the FDIC two late charges. And Appellants might prevail on remand in reducing their liability on the 18092 Loan by $80,000. So we leave any modification of the fee award, entered after this appeal was taken, to the district court.

**IV.**

For the foregoing reasons, we reverse the district court's order containing its findings of facts and conclusions of law to the extent it concludes (1) that TCB did not receive the funds drawn from BGF's bank account on July 28, 2010, and (2) that BGF and the Thorntons were liable for $11,513.18 in late charges. We vacate the judgment and remand for further proceedings consistent with this opinion.