# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 18, 2015 Session

## WM CAPITAL PARTNERS, LLC v. ANTHONY W. THORNTON, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 1493I    Claudia Bonnyman, Chancellor**

———————————————————

**No. M2015-00328-COA-R3-CV – Filed December 29, 2016**

———————————————————

A secured creditor filed suit against a trucking company and two guarantors seeking a deficiency judgment after disposition of the collateral securing payment of the debt. The trial court granted the secured creditor summary judgment in the amount of the deficiency. On appeal, the trucking company and the guarantors argue that (1) the delay in repossessing the collateral rendered its disposition commercially unreasonable and (2) the secured creditor failed to present sufficient evidence of the amount of its damages. We conclude that the requirement of a commercially reasonable disposition found in Tennessee Code Annotated § 47-9-610 only applies once the secured party has actual or constructive possession of the collateral. The secured creditor's refusal to repossess the collateral at the trucking company's request did not amount to actual or constructive possession. Nonetheless, in light of the challenge to the time aspect of the disposition, the secured creditor failed to meet its burden of production on summary judgment. Therefore, we reverse the grant of summary judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Eugene N. Bulso, Jr., Steven A. Nieters, and Paul J. Krog, Nashville, Tennessee, for the appellants, Anthony W. Thornton, Elizabeth Thornton, and Bowling Green Freight, Inc.

Samuel P. Funk and W. Scott Sims, Nashville, Tennessee, for the appellee, WM Capital Partners, LLC.

## OPINION

### I. FACTUAL BACKGROUND

The facts are largely undisputed.[1] Anthony and Elizabeth Thornton owned and operated Bowling Green Freight, Inc., a trucking company that derived significant income from transporting parts to General Motors Corporation's Corvette plant in Bowling Green, Kentucky. *See F.D.I.C. v. Thornton*, 595 F. App'x 513, 515 (6th Cir. 2014). Over time, Tennessee Commerce Bank (the "Bank") made several loans to Bowling Green Freight. In connection with these loans, Bowling Green Freight granted the Bank a security interest in, among other things, equipment. Mr. and Mrs. Thornton also unconditionally guaranteed payment of the loans to the Bank.

General Motors' financial difficulties during the last decade put corresponding financial pressure on Bowling Green Freight. *Id.* After defaulting on its loans to the Bank, Bowling Green Freight and the Bank entered into a forbearance agreement, in which Bowling Green Freight acknowledged that it was in default and that it had no claims or defenses to the Bank's right to pursue its legal and contractual remedies. In return, the Bank agreed not to exercise its rights if Bowling Green Freight cured its default by February 28, 2011. When Bowling Green Freight was unable to do so, the Bank and Bowling Green Freight entered into amended forbearance agreements, which ultimately extended the forbearance period to July 5, 2011.

Because Bowling Green Freight had lost the General Motors business and Mr. Thornton realized that Bowling Green Freight could no longer make payments on the loans, he asked the Bank to repossess Bowling Green Freight's collateral, sell it, and apply the proceeds to the outstanding loans. When this request was made on June 23, 2011, the value of the collateral exceeded the outstanding balance of the loans. Despite this fact, the Bank declined the offer and instead directed Bowling Green Freight to continue to use the collateral, including the equipment. Subsequent requests to repossess the collateral were made, but in each instance, the Bank declined.

On August 17, 2011, the Bank demanded payment in full of the loans, and in January 2012, the Bank filed suit against Bowling Green Freight and the Thorntons. *Id.* at 516. But, the same day it filed suit, the Bank, facing financial difficulties of its own, was placed into a receivership with the Federal Deposit Insurance Corporation ("FDIC"). *Id.*

---

[1] Except as otherwise indicated, the facts are taken from the parties' statements of undisputed material facts. In some instances, the facts are undisputed only for the purposes of ruling on the motion for summary judgment. *See* Tenn. R. Civ. P. 56.03.

While the suit was pending, on August 9, 2012, the FDIC, as receiver for the Bank, sold three of the loans involved, identified as Notes 184900, 18107, and 18224, to WM Capital Partners, LLC ("WMCP"). WMCP moved and received leave to intervene in the suit originally filed by the Bank. *Id.* at 517. By this point, the case had been removed to federal district court, and the FDIC had been substituted as plaintiff for the Bank. *Id.*

Unfortunately for WMCP, the suit originally filed by the Bank did not include a claim against the Thorntons for breach of their guaranty relative to Note 184900, the loan with the largest outstanding balance. *Id.* WMCP moved to add the claim to the suit, but the district court denied the motion. *Id.* The district court did permit WMCP to dismiss its other claims without prejudice, which led to the present action. *Id.*

At some point, WMCP finally repossessed the collateral securing all three of the loans. WMCP sold the collateral at auction on July 11, 2013. WMCP applied the net proceeds of the sale to the principal owed on Note 184900.

## II. PROCEDURAL HISTORY

The following year in the Chancery Court for Davidson County, Tennessee, WMCP filed suit against the Thorntons seeking a deficiency judgment based on their personal guarantees. WMCP later amended its complaint to add a breach of contract claim against Bowling Green Freight.

WMCP moved for summary judgment. In support of its motion, WMCP submitted a statement of undisputed material facts and the affidavit of Jim Barr Coleman. Mr. Coleman recounted the history of the loans, the purchase of the loans from the FDIC, and WMCP's repossession and sale of the collateral securing the loans. He explained the application of the net proceeds from the sale to the debt and attested to the amount owed by Bowling Green Freight on each of the three loans as of December 1, 2014.

In opposition to the motion for summary judgment, Bowling Green Freight and the Thorntons filed the affidavits of Mr. Thornton and his attorney and their own interrogatory responses. In his affidavit, Mr. Thornton recounted his requests to the Bank to repossess the collateral securing the loans and the Bank's refusals. The attorney's affidavit described the federal lawsuit. The affidavit also included a copy of an affidavit filed in the federal case on behalf of WMCP, which contained statements allegedly inconsistent with the affidavit of Mr. Coleman.

The chancery court granted the motion for summary judgment. The court found that Bowling Green Freight executed the documents evidencing its indebtedness under the loans and defaulted on its obligations. The court also found that the Thorntons had

unconditionally guaranteed Bowling Green Freight's indebtedness to the Bank. WMCP established that it was the successor to the rights of the Bank under the loan documents. The court also determined that WMCP's disposition of the collateral was commercially reasonable. The court awarded a judgment in favor of WMCP and against Bowling Green Freight and the Thorntons in the amount of $6,507,435.10.

## III. ANALYSIS

On appeal, Bowling Green Freight and the Thorntons identify six issues for review. But they acknowledge, and we agree, that there are two primary issues.[2] First, whether the delay between the date the Bank was first asked to repossess its collateral and the date of the auction of the collateral by WMCP rendered the disposition commercially unreasonable. Second, whether WMCP met its burden of production with respect to the amount of damages.

### A. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party has the burden of persuading the court that no genuine issues of material fact exist and that it is entitled to a judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If the moving party satisfies its burden, then the nonmoving party must demonstrate that there is a genuine, material factual dispute, or the motion for summary judgment will be granted. *Id.* A trial court decision on summary judgment presents a question of law, which we review de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015), *cert. denied*, 136 S. Ct. 2452, 195 L. Ed. 2d 265 (2016) (citations omitted). Therefore, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.*

### B. DISPOSITION OF THE COLLATERAL

Article 9 of the Uniform Commercial Code as adopted by Tennessee governs a transaction, such as the one between the Bank and Bowling Green Freight, "that creates a

---

[2] Only one of the six issues raised is unrelated to the two primary issues. Bowling Green Freight and the Thorntons submit that the chancery court erred in interpreting Rule 56.03 of the Tennessee Rules of Civil Procedure as not permitting a non-moving party to submit a statement of additional undisputed facts. But as Bowling Green Freight and the Thorntons acknowledge, in its oral ruling, the transcript of which was incorporated by reference in the final judgment, the court states specifically that it considered the statement of additional undisputed facts. Hence any error in the court's interpretation of the rule was harmless. *See* Tenn. R. App. P. 36(b).

security interest in personal property." Tenn. Code Ann. § 47-9-109(a)(1) (2013). Article 9 "provides a comprehensive scheme for the regulation of security interests in personal property and fixtures." U.C.C. § 9-109 cmt. 1 (2014). It regulates everything from the creation and attachment of the security interest to rights after default and the enforcement of the security interest. *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 899 (Tenn. 2007).

Our focus in this case is on the steps taken by both the Bank and WMCP after default. Upon default, the secured creditor "may reduce a claim to judgment, foreclose, or otherwise enforce" its claim or security interest. Tenn. Code Ann. § 47-9-601(a)(1) (2013). In addition, the secured creditor "may take possession" of any collateral after default. *Id.* § 47-9-609 (2013).

1.  The Requirement of a Commercially Reasonable Disposition

After taking possession of the collateral after default, the secured creditor has the option of proposing to accept the collateral in full or partial satisfaction of the debt or of disposing of the collateral. *Id.* §§ 47-9-620, -610 (2013). If the secured creditor chooses to dispose of the collateral, then "[e]very aspect of [the] disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id.* § 47-9-610(b).

The failure to conduct a commercially reasonable disposition is significant for both the secured creditor and parties obligated on the debt. If the issue is raised in an action to recover a deficiency judgment,[3] a presumption arises that "the amount of proceeds that would have been realized [in a commercially reasonable disposition] is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum." *Id.* § 47-9-626(4) (2013). Under this "Rebuttable Presumption Rule," the secured party may be denied a deficiency judgment. *Id.* § 47-9-626(3), (4); U.C.C. § 9-626 cmt. 3 (2014).

Bowling Green Freight and the Thorntons complain that the time aspect of the disposition of the collateral securing the loans at issue was not commercially reasonable. They note that over two years lapsed between Mr. Thornton's request that the Bank repossess its collateral and the date WMCP finally auctioned the collateral. For purposes of summary judgment, WMCP also agreed that "[the Bank's] refusal to accept the tender was commercially unreasonable and caused the value of the collateral to plummet due to inescapable depreciation of the equipment in question." The trial court concluded that this fact was not material to the outcome of this case.

---

[3] Under Article 9, "[i]f the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by [Article 9] . . . the obligor is liable for any deficiency." Tenn. Code Ann. § 47-9-615(d) (2013).

We agree that the Bank's refusal to repossess the collateral standing alone did not render the disposition commercially unreasonable for purposes of Article 9. Bowling Green Freight and the Thorntons would have us interpret Article 9 to require a secured creditor to repossess collateral after default upon request of the debtor or an obligor.[4] But the statutory language includes no duty on the part of a secured party to accede to such a request or right on the part of a debtor or obligor to make such a request.

Default engenders rights in the secured party, but these rights are optional. As a result, a secured party must consider, not only what options to pursue, but when and how to pursue them. One consideration is whether to make use of self-help remedies or to resort to the courts. As noted above, in addition to any rights provided by the agreement of the parties, the secured party "[*m*]*ay* reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure." Tenn. Code Ann. § 47-9-601(a)(1) (emphasis added). Although the rights may be exercised simultaneously, no particular sequence for exercise of the secured party's rights is mandated. *See id.* § 47-9-601(c). Article 9 specifically contemplates that a secured party might reduce its claim to judgment before resorting to any collateral. *See id.* § 47-9-601(e), (f).

After deciding to resort to collateral, a secured party "*may* take possession," but a secured party also, "without removal, *may* render equipment unusable and dispose of collateral on the debtor's premises." *Id.* § 47-9-609(a) (emphasis added). The use of the word "may" in referencing each of these rights and the context confirms that the secured party has discretion in choosing which rights to exercise and when. *See Colella v. Whitt*, 308 S.W.2d 369, 371 (Tenn. 1957) ("'May' ordinarily connotes discretion or permission; and it will not be treated as a word of command unless there is something in the context or subject matter of the act or statute under consideration to indicate that it was used in that sense."). Article 9 provides no basis for either a debtor or an obligor to deprive a secured party of its rights upon default by demanding that one right be pursued over another. *Cf. N.C. Nat'l Bank v. Sharpe*, 241 S.E.2d 360, 361 (N.C. Ct. App. 1978)

---

[4] "Debtor" and "obligor" are terms of art under Article 9. "Debtor" refers to, among other things, "[a] person having an interest or other lien, in the collateral, whether or not the person is an obligor." Tenn. Code Ann. § 47-9-102(a)(28) (2013). "Obligor" refers to,

> a person that, with respect to an obligation secured by a security interest in or an agricultural lien on the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation.

*Id.* § 47-9-102(a)(59). In this case, Bowling Green Freight is both a debtor and an obligor while the Thorntons are secondary obligors. *See id.* § 47-9-102(a)(72).

(Under North Carolina's version of pre-revision Article 9,[5] "the right of the secured party to take possession does not impose an obligation to take possession upon demand of the debtor.").

Article 9 does place limits on the secured party's rights. For instance, after deciding to resort to collateral, a secured party may not repossess the collateral or render equipment unusable without judicial process if doing so would result in a "breach of the peace." Tenn. Code Ann. § 47-9-609(b)(2). The disposition of the collateral must also be "commercially reasonable." *Id.* § 47-9-610(b).

Even if they cannot dictate when collateral should be repossessed and sold, Bowling Green Freight and the Thorntons argue that the delay in auctioning the collateral was nonetheless "commercially unreasonable." They interpret the commercial reasonable disposition requirement found in Tennessee Code Annotated § 47-9-610 as, in effect, imposing a time limit on the secured party to dispose of collateral after default. In support of this interpretation, they cite two prior decisions of this Court.

A close review of the cases relied upon by Bowling Green Freight and the Thorntons, however, reveals an important distinction between those cases and the present situation. In the earlier of the two cases, *Nationsbank v. Clegg*, the debtor/obligor volunteered to deliver collateral, a car, to the secured party, a bank. No. 01-A-01-9510-CH00469, 1996 WL 165513, at \*1 (Tenn. Ct. App. Apr. 10, 1996), *overruled on other grounds by Auto Credit of Nashville*, 231 S.W.3d at 902 & n.3. Significantly, the bank replied "that it would retrieve the vehicle itself in accord with its own internal procedures for repossession, and that he was not to deliver the car to them." *Id.* After 13 months, during which time the vehicle sat idle, the secured party sold the vehicle. *Id.* We concluded that the sale "was not effected in a commercially reasonable manner." *Id.* at \*6.[6]

In concluding the sale was not commercially reasonable, we did call attention to the passage of time between default and disposition.

Of concern to this Court is the fact that the secured parties in this

---

[5] In 1998, the American Law Institute and the National Conference of Commissioners on Uniform State Laws approved comprehensive revisions to Article 9 of the Uniform Commercial Code. U.C.C. § 9-101 cmt. 2 & 4 (2014); *see also* Robert M. Lloyd, *The New Article 9: Its Impact on Tennessee Law (Part I)*, 67 Tenn. L. Rev. 125, 127-28 (1999). All fifty states have adopted these revisions. *Auto Credit of Nashville*, 231 S.W.3d at 899. Throughout this opinion, we refer to the version of Article 9 prior to adoption of these revisions as "pre-revision Article 9."

[6] We applied pre-revision Article 9, but pre-revision Article 9 also required that every aspect of a disposition be commercially reasonable. *Nationsbank*, 1996 WL 165513, at \*3; Tenn. Code Ann. § 47-9-504(3) (2000), *amended by* 2000 Tenn. Pub. Acts 2402 (ch. 846).

instance permitted an automobile to sit idly for over 13 months after default. The UCC does not state particular time limits for a secured party to take possession of the collateral, or to proceed with a sale following the taking of possession. The determination of whether delay is commercially unreasonable requires a consideration of all surrounding circumstances, including market conditions, the possible physical deterioration of the collateral, its economic deterioration through obsolescence, and the time required to assemble the collateral and prepare it for sale.

*Id.* However, before considering whether the disposition was commercially reasonable, we first held that the secured party had "constructive possession" of the collateral. *Id.* at *3. Possession of the collateral was a necessary prerequisite to the secured party's obligation to conduct a commercially reasonable disposition.

In a later reported decision, we concluded a secured party's over-seven-month delay in disposing of collateral after acquiring the secured obligation was one factor of several that rendered a disposition commercially unreasonable. *R & J of Tennessee, Inc. v. Blankenship-Melton Real Estate*, 166 S.W.3d 195, 209-10 (Tenn. Ct. App. 2004), *overruled on other grounds by Auto Credit of Nashville*, 231 S.W.3d at 902. Although we cited with approval our earlier decision in *Nationsbank v. Clegg*, we made no mention of constructive possession. *Id.* at 207-08. However, holding that the secured party had at least constructive possession was implicit in our reasoning, as we also concluded that the secured party violated its duties under Tennessee Code Annotated § 47-9-207(a).[7] *Id.* at 208. The duties imposed by Tennessee Code Annotated § 47-9-207 only arise when a secured party is in possession or control of collateral. Tenn. Code Ann. § 47-9-207 (2013).

Consistent with our prior precedent, we conclude that the requirement for a commercially reasonable disposition applies only once the secured party has possession, either actual or constructive, of the collateral. *See Regions Bank v. Trailer Source*, No. M2008-01167-COA-R3-CV, 2010 WL 2074590, at *4 (Tenn. Ct. App. May 21, 2010) ("'**The legal significance of constructive possession** is that it triggers an obligation under the Tennessee Commercial Code to use reasonable care in the custody and preservation of collateral **as well as its disposition.**'"). We note courts in other states, in interpreting Article 9's commercially reasonable disposition requirement, have reached the same conclusion. *See, e.g.*, *Marks v. Powell*, 162 B.R. 820, 829 (E.D. Ark. 1993) (under Arkansas' version of pre-revision Article 9, applying the commercially reasonable standard once the secured party had "taken possession or constructive possession");

---

[7] Subsection (a) of the statute provides that "a secured party shall use reasonable care in the custody and preservation of collateral *in the secured party's possession*." Tenn. Code Ann. § 47-9-207(a) (emphasis added). The duty arises "when the secured party has possession of collateral either before or after default." U.C.C. § 9-207 cmt. 4 (2014); *see also* Tenn. Code Ann. § 47-9-601(b).

8

*Conn. Nat. Bank v. Douglas*, 606 A.2d 684, 687-88 (Conn. 1992) (under Connecticut's version of pre-revision Article 9, calling constructive possession the "linchpin" of a failure to act in a commercially reasonable manner defense); *Arlington Trust Co. v. Caimi*, 610 N.E.2d 948, 952 (Mass. 1993) (Under Massachusetts' version of pre-revision Article 9, "[a] necessary prerequisite to a commercially unreasonable disposition of collateral . . . is possession, for one cannot dispose of what one does not have."); *Michigan Nat. Bank v. Marston*, 185 N.W.2d 47, 51 (Mich. Ct. App. 1970) (Under Michigan's version of pre-revision Article 9, "[o]nce a creditor has possession he must act in a commercially reasonable manner toward sale, lease, proposed retention where permissible, or other disposition."). These cases represent more than guides for interpretation. *See Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 751 n.2 (Tenn. 2001). Consistency with the other courts' interpretation of the commercially reasonable disposition requirement promotes the important goal of uniformity, one of the main purposes of the UCC. *See Wakefield v. Crawley*, 6 S.W.3d 442, 450 (Tenn. 1999).

Whether a secured party has possession of collateral is a question of fact. *Nationsbank*, 1996 WL 165513, at *2. In some instances, although the collateral is in the possession of another, the secured party may nonetheless have possession, for example when the party in actual possession acts as the agent of the secured party. *See* U.C.C. § 9-313 cmt. 3 (2014).

Constructive possession is a more difficult concept than actual possession. We have previously described constructive possession as having a "sufficient 'right to control'" the collateral. *Nationsbank*, 1996 WL 165513, at *3. But such a description is too broad in that any secured party will have a right to control collateral by both agreement with the debtor and operation of Article 9. A more precise description or definition of constructive possession is the exercise of "[c]ontrol or dominion over a property without actual possession or custody of it." Black's Law Dictionary 1351 (10th ed. 2014).

Although we recognize the factual similarities between our decision in *R & J of Tennessee, Inc. v. Blankenship-Melton Real Estate* and this case, we conclude that declining a request to repossess collateral does not, without more, amount to constructive possession. The only evidence of the Bank exercising any control or dominion over the property after default is its direction to Bowling Green Freight to continue its use of the collateral. Under these facts, we also conclude that this direction falls short of constructive possession. However, rejecting the date that Bowling Green Freight and the Thorntons propose for the commencement of the commercial reasonableness requirement does not end our inquiry.

2.    Compliance with the Commercially Reasonable Disposition Requirement

Unless the secured party's compliance is placed in issue, "[a] secured party need

9

not prove compliance with the provisions of [Article 9] relating to collection, enforcement, disposition, or acceptance." Tenn. Code Ann. § 47-9-626(1) (2013). Here Bowling Green Freight and the Thorntons placed WMCP's compliance with the disposition requirements of Article 9 in issue, specifically, the time aspect of the deposition. As a result, WMCP bore the burden of proving that the time aspect of the disposition was commercially reasonable. *Id.* §§ 47-9-626(2), -610(b).

Meeting this burden required a showing that the time between possession (or constructive possession) of the collateral and its ultimate disposition was commercially reasonable. The record reveals that the collateral was disposed of on July 11, 2013, but we do not know when WMCP asserts it took possession. Presumably WMCP contends this occurred on the date of repossession of the collateral, but the proof presented by WMCP does not establish this date. Further, WMCP failed to offer any proof showing that the time between repossession and disposition was commercially reasonable. Because WMCP failed to meet its burden of production, the trial court should have denied the motion for summary judgment. *See Shipley v. Williams*, 350 S.W.3d 527, 535 (Tenn. 2011).

## C. DAMAGES

Bowling Green Freight and the Thorntons also take issue with WMCP's proof of its damages. However, our resolution of the previous issue renders review of this issue unnecessary.

## IV. CONCLUSION

We conclude that the requirement for a commercially reasonable disposition found in Tennessee Code Annotated § 47-9-610 applies only once the secured party has possession, either actual or constructive, of the collateral. The Bank had no obligation to agree to the debtor's request to repossess the collateral, and the Bank's actions in refusing the request did not render the subsequent disposition of the collateral commercially unreasonable as a matter of law. But, we conclude that WMCP failed to satisfy its burden of production, and therefore, we reverse the grant of summary judgment.

_____
W. NEAL MCBRAYER, JUDGE